[No. 67247-9-I.   Division One.   December 24, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. JEROME JAYVON BLAKE, *Appellant*.

516

*Dana M. Nelson* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Mark K. Roe, Prosecuting Attorney*, and *Mary K. Webber, Deputy*, for respondent.

¶1 DWYER, J. — As authorized by the Rules of Evidence, a lay witness may testify as to observations gleaned from his or her senses as well as to inferences arising from those perceptions. A witness need not have had actual visual perception of an event to testify that it occurred. Here, Jerome Blake contends that the jury heard impermissible opinion testimony from two witnesses—who testified that Blake shot Marquise Brown—because these two witnesses did not physically see the shot as it was being fired from the gun. Because this challenged testimony did not express impermissible opinions on guilt and because the experienced trial judge ruled correctly regarding this and all other issues to which error has been assigned, we affirm.

## I

¶2 On the evening of June 22, 2010, Blake, along with Arthur Cooper and Brandon Lewis, decided to purchase OxyContin pills. Quinlin Bess, a friend of Cooper, initiated a drug deal to acquire the OxyContin on behalf of the purchasers with the help of Ivor Williams. Williams connected Bess with a seller, Marquise Brown.

¶3 Brown, however, schemed to surreptitiously sell OxyContin pills that could not be smoked and, thus, were less desirable as street drugs. Recognizing that problems might ensue, Brown telephoned his brother, James Baskin, and instructed him not to answer any telephone calls for the rest of the evening from Brown himself or from any telephone numbers that Baskin did not recognize. Brown then assigned to Baskin's telephone number in his cell phone the fictitious name "Mike."

¶4 Bess, carrying $2,400 of the purchasers' money, thereafter met with Williams and Brown. The three drove to the house of Brown's friend where the pills were stored. Bess gave Brown the $2,400 and then departed with the pills. Later in the evening, Bess realized that the pills could not be smoked. Bess reported to Cooper and Blake that the pills

were "fake" and that he would try to get their money back. Bess, joined by his girl friend, Tricia Hawthorne, then met with Brown and Williams.

¶5  Bess confronted Brown about the "fake" pills. In turn, Brown telephoned "Mike" in a feigned attempt to retrieve the $2,400. Brown claimed that it was "Mike" who had delivered the pills. Supposedly looking for "Mike," the group drove to a nearby park and searched the surrounding neighborhood. Blake and Cooper then joined the group, which continued to search for "Mike" in an attempt to retrieve the purchase money. Ultimately, Williams noted that tension was rising among the group. While the group was standing outside of their vehicles, Williams saw Blake put his hands under his shirt, and he heard a metallic "click-click" sound.

¶6  Blake began speaking with Brown. Brown, who was terrified, was on his knees with his pockets turned out. Brown was pleading with Blake, telling Blake that he did not have his money but that he would get it for him. Bess turned away to telephone "Mike." At this time, Blake was standing roughly 3 feet from Brown, and Cooper and Williams were standing roughly 10 feet from Brown. Blake was standing to the right of Williams. An instant later, Brown was shot and he toppled to the ground. Williams described seeing a muzzle flash on his right side. Brown died from the gunshot wound; physical evidence later indicated that the gun was less than one foot from Brown's head when it was fired and that the path of the bullet went from the front, right side of his head to the rear, left side.

¶7  In the immediate aftermath of the shooting, Bess ran to Hawthorne's car, and they drove to Jamie Mayer's house. Bess noticed a wound on his neck that he thought resulted from the bullet skimming his neck.[1] Bess and Hawthorne

---

[1] After later speaking with the police and being informed of the physical evidence at the scene of the shooting, Bess came to believe that the more likely cause of the wound on his neck was the shell casing as it ejected from the gun, rather than the bullet itself.

arrived at Mayer's house within 12 minutes of the shooting. Blake arrived shortly thereafter. When Bess saw Blake, Bess, referring to the wound on his neck, accused Blake of shooting him. Blake replied, "[M]y bad, my bad."

¶8 Detective Kevin Allen investigated the shooting. Allen determined that at the time that Bess turned away from Brown just before the shooting, he had telephoned Baskin and left a voice mail that recorded some of the commotion that occurred around the time of the shooting. The recording included the following utterances:

> [Bess]: "Hey bro. This ain't, this ain't your little homeboy, my nigger, we seen you drive off, bro, you took somethin' that don't belong to you, my nigger, you're . . . ." [muffled noises] "Go, go, go."
>
> [Hawthorne]: "Who did he shoot? Why was he shooting? Who did he shoot?"
>
> [Bess]: "I don't know. Coop[2] didn't shoot nobody."
>
> [Hawthorne]: "Who shot?"
>
> [Bess]: "Just go."
>
> [Hawthorne]: "You did? Jay[3] did? Did Jay?
>
> [Bess]: "Yes."

Br. of Appellant at 11.

¶9 Bess and Hawthorne, fearing retaliation from Baskin, sought protection from the police. They were referred to Detective Allen. Bess told Allen that Blake was the person who had shot Brown. Bess indicated to Detective Allen that Williams was also present at the scene of the shooting. The police later interviewed Williams, who was shown a photomontage from which he also identified Blake as the shooter. Both Bess and Williams claimed to have not been looking directly toward Brown at the time of the shooting but surmised that Blake was the shooter based on the surrounding circumstances.

---

[2] Cooper was known as "Coop."

[3] Blake was known as "Jay."

¶10 The State thereafter charged Blake with one count of murder in the first degree with a firearm enhancement. Prior to trial, Blake moved to exclude the voice mail recording, wherein Bess identified Blake as the shooter by responding "yes" to Hawthorne's question, claiming that it was inadmissible hearsay. The trial court denied the motion, ruling that the content of the statement in the recorded message qualified as both an excited utterance and a present sense impression, and that the statement was therefore admissible.

¶11 The defense also sought introduction of impeachment evidence demonstrating Bess's bias (as a witness for the State). The proposed evidence concerned an occasion in which Hawthorne reported to the police domestic violence perpetrated upon her by Bess. This, according to Blake, gave Bess a motive to lie to Hawthorne when he made comments to her about the identity of the shooter. The trial court excluded the proffered evidence, ruling that it was not sufficiently relevant to any fact in issue.

¶12 The defense also moved pretrial to preclude any witness from offering testimony that constituted an opinion on the guilt of the defendant. Blake specifically requested that Detective Allen be precluded from testifying that Hawthorne's and Bess's initial statements to the police were consistent with each other. The court granted the motion.

¶13 The jury found Blake guilty as charged. Blake was sentenced to a standard range sentence of 380 months of incarceration.

¶14 Blake appeals.

II

A

¶15 Blake first asserts that reversal is warranted because the jury was allowed to hear improper opinions by lay

witnesses regarding Blake's guilt. Because no such impermissible opinions on guilt were offered, this claim fails.

¶16 Evidence Rule (ER) 701 allows testimony as to "opinions or inferences which are (a) rationally based on the perception of the witness, [and] (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Similarly, ER 704 provides that "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Case law establishes that the limits of ER 701 and ER 704 are exceeded when a witness testifies "in the form of an opinion regarding the guilt . . . of the defendant," *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001), because such an opinion " 'invad[es] the exclusive province of the [jury].' " *Demery*, 144 Wn.2d at 759 (alterations in original) (internal quotation marks omitted) (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993)). However, "testimony that . . . is based on inferences from the evidence is not improper opinion testimony." *Heatley*, 70 Wn. App. at 578. "The fact that an opinion supports a finding of guilt . . . does not make the opinion improper." *State v. Collins*, 152 Wn. App. 429, 436, 216 P.3d 463 (2009).

¶17 A trial court's ruling on the admissibility of opinion evidence is reviewed for abuse of discretion. *Demery*, 144 Wn.2d at 758. Here, Detective Allen testified that both Bess and Williams identified Blake as the shooter. During direct examination by the prosecutor, Detective Allen was asked, "[T]hroughout the course of that interview, was Mr. Bess consistent on who the shooter was?" He replied, "Very. He did not waver as to who the shooter was." Detective Allen later stated, "We knew Mr. Blake had been identified by Mr. Bess already." When asked about Williams's identification to police, the prosecutor asked, "When you showed Ivor Williams the photo array . . . what was Ivor Williams's reaction? What did he say?" The detective re-

plied, "Immediately, he selected JG.[4] I don't recall exactly what he said, but he pointed to the picture and indicated that's JG, something to that very specific effect."

¶18 Later in the trial, Williams testified as to his recollection of the shooting. He was asked, "Based on the relative position of where you were, where Cooper was, where [Blake] was, who did the muzzle flash come from?" He replied, "I would say it came from [Blake] because he was on my right." He later explained,

> I didn't see the person that pulled the trigger. I saw the flash, you understand. It came from my right side. [Blake] was on my right side. I didn't see the gun. I just saw the flash, and I heard it. Instantly, when I saw the flash and heard the sound, like I told you, I took off and ran. I was already trying to make my way out of the situation anyway.

¶19 Bess's testimony was similarly based on his perceptions of the circumstances surrounding the shooting; defense counsel asked him:

> Q: Mr. Bess, I will attempt not to belabor it too much longer. To the best of your recollection, considering now all the information that you know, your observations on the night of the shooting and whatever information you learned from Detective Allen, you're saying—your testimony is today that State's Exhibit 99 is your best recollection of where everybody was standing just prior to the shooting?
>
> A: Yes ma'am. Yes, ma'am. But I didn't see honestly—I just heard the bang, and logically it was only one person that could have made that bang as close as they were with me. YG[5] did not have a gun, and he was standing four or five feet behind me. I know he looked suspicious.
>
> Q: By "he," you mean JG?
>
> A: Yes.
>
> Q: JG looked suspicious?

---

[4] Blake was also known as "JG."

[5] Brown was known as "YG."

A: Yes.

Q: So it was based on those two things, right?

A: Yes.

Q: That JG looked suspicious and that is where they were standing, and that is why you think JG is the shooter?

A: How close he was to my head, how loud I heard the pop.

Q: You didn't actually see who the shooter was? That's just how you got to that conclusion, correct?

A: Yes.

¶20 Finally, when Hawthorne took the stand, she was asked what Bess told her when he initially got into her car after the shooting. She replied, "He said [Blake] shot that boy."

¶21 Blake assigns error to the following testimony: (1) Bess's identification of Blake as the shooter to the police, which was brought into trial through Allen's testimony; (2) Bess's identification of Blake as the shooter while testifying at trial; (3) Bess's statement to Hawthorne identifying Blake as the shooter, which was brought into trial through Hawthorne's testimony; (4) Bess's exclamations in the voice mail recording, which was played for the jury; (5) Williams's identification of Blake as the shooter to the police, which was brought into trial through Detective Allen's testimony; and (6) Williams's identification of Blake as the shooter while testifying at trial.

¶22 All of the challenged testimony was based upon direct and specific observations by Bess and Williams, who were in the immediate vicinity of the shooting. The testimony was fact-based: it discussed the shooting, the positions of the people at the scene, and Bess's and Williams's other observations. The descriptions of the events surrounding the shooting had a tendency to help the jury better understand what happened, thus facilitating the jury's fact-finding function. Bess's and Williams's testimony did not contain conclusory legal terms, such as "guilt" or "intent." Because the witnesses' testimony stemmed from

their own sensory perceptions, the jury was free to disbelieve either or both witnesses and reach a finding of not guilty. Consequently, the testimony in question did not constitute opinions at all; rather, the testimony was to "inferences from the evidence." *Heatley*, 70 Wn. App. at 578.

¶23 Nevertheless, Blake asserts that Bess's and Williams' testimony was based on their opinions. This is so, Blake contends, because "opinion evidence" means " '[e]vidence of what a witness . . . infers in regard to facts in dispute, as distinguished from his personal knowledge of the facts themselves.' " Br. of Appellant at 24 (quoting BLACK'S LAW DICTIONARY 1093 (6th ed. 1990)). By resorting to this dictionary definition, Blake seeks to conflate the meanings of "opinion" and "inference" and thereby eliminate the effect of the Supreme Court's choice to include both terms in ER 701 and ER 704.

¶24 We recognize that ER 701 and ER 704 do not explicitly distinguish between "opinions" and "inferences." Nevertheless, it is clear that the Supreme Court did not consider the words to be synonyms. Indeed, there would have been no reason for the Supreme Court to have included each word in each rule if the only result was to be redundancy.

¶25 Significantly, case law does not support the contention that the challenged testimony included impermissible opinion on guilt, as opposed to allowable testimony as to inferences or fact-based observations. *See, e.g., State v. Mason*, 160 Wn.2d 910, 932, 162 P.3d 396 (2007) (death certificate from medical examiner admissible because based on specific observations and evidence referenced death rather than guilt); *Heatley*, 70 Wn. App. at 581 (testimony admissible because it was based on direct observation, was helpful to the jury, and was not framed in conclusory terms that parroted a legal standard); *State v. Sanders*, 66 Wn. App. 380, 388-89, 832 P.2d 1326 (1992) (testimony admissible because it did not prevent jury from rejecting the testimony and finding defendant not guilty).

¶26 While we believe the challenged testimony to consist of inferences, rather than opinions, our decision is not solely based on this determination. Even were we to consider the challenged testimony to include opinion evidence, our decision would be the same. Our Supreme Court has set forth a method of determining the admissibility of challenged opinion testimony. Upon proper objection,

> the trial court must determine its admissibility. In determining whether such statements are impermissible opinion testimony, the court will consider the circumstances of the case, including the following factors: "(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact."
>
> However, this court has held that there are some areas that are clearly inappropriate for opinion testimony in criminal trials. Among these are opinions, particularly expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses.

*State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (citations and internal quotation marks omitted) (quoting *Demery*, 144 Wn.2d at 759).

¶27 The challenged testimony did not concern an opinion on Blake's intent. The challenged testimony did not concern the veracity of any witness. And the challenged testimony was not a statement of the witnesses' belief as to Blake's guilt. Thus, the challenged testimony was not of a type categorically excluded by *Montgomery* or *Demery*.

¶28 In *State v. King*, 167 Wn.2d 324, 219 P.3d 642 (2009), a witness's improper opinion on guilt was illustrated. In that case, a police officer testified that he had been trained on the elements of reckless driving and that King's observed conduct was within those elements. 167 Wn.2d at 330. The Supreme Court held this testimony to be an improper opinion on King's guilt. 167 Wn.2d at 331. Here, the challenged testimony was solely as to perceived facts and inferences therefrom. This was proper testimony. The

testimony in no way "undermine[d the] jury's independent determination of the facts." *State v. Olmedo*, 112 Wn. App. 525, 531, 49 P.3d 960 (2002).

¶29 "Evidence is not improper when the testimony is not a direct comment on the defendant's guilt, is helpful to the jury, and [is] based on inferences from the evidence." *Olmedo*, 112 Wn. App. at 531. In *Olmedo*, the defendants were charged with unlawful storage of anhydrous ammonia. This substance must be stored in containers approved by the United States Department of Transportation (DOT) or otherwise meeting "federal industrial health and safety standards for holding anhydrous ammonia." 112 Wn. App. at 529. The trial court denied Olmedo's request to instruct the jury as to the definition of "a DOT 'approved' tank or identify the applicable state and federal standards." 112 Wn. App. at 530.

■ ¶30 The court did, however, allow a witness to testify such that "[t]he gist of his testimony indicated the propane tanks did not meet legal requirements *as he understood them*." 112 Wn. App. at 529 (emphasis added). The appellate court held that this testimony consisted of "improper opinions on the appellants' guilt." 112 Wn. App. at 532. This was because the court viewed the "testimony as giving improper legal conclusions." 112 Wn. App. at 532. "Improper legal conclusions include testimony that a particular law applies to the case, or testimony that the defendant's conduct violated a particular law." 112 Wn. App. at 532.[6] Neither Bess's testimony nor Williams's testimony included any statements that constituted legal conclusions.

■ ¶31 Opinion testimony concerning ultimate issues of fact is not always impermissible. Indeed, "opinion testimony may *not* be excluded under ER 704 on the basis that it encompasses ultimate issues of fact." *Heatley*, 70 Wn.

---

[6] The court observed that whether "the tank was approved was a core element of the charges against" the defendants. 112 Wn. App. at 532. Blake argues that this means that no testimony based on inferences can ever be admitted when that testimony is relevant to a "core element." The *Olmedo* court did not so hold.

App. at 578-79 (emphasis added). Bess's and Williams' testimony did not constitute "expressions of personal belief," *Montgomery*, 163 Wn.2d at 591, merely because some of the testimony may have "encompasse[d] ultimate issues of fact." *Heatley*, 70 Wn. App. at 578-79.

¶32 Analysis of the five factors set forth in *Montgomery* and *Demery* further supports admission of the evidence. Bess and Williams were lay witnesses, whose testimony did not carry any " 'special aura of reliability.' " *King*, 167 Wn.2d at 331 (police officer's testimony may carry special aura of reliability) (quoting *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007) (same)). The nature of the challenged testimony was that of otherwise allowable inferences drawn from facts directly perceived by the witnesses' senses. The charge was murder, arising from an assaultive act that resulted in fatal consequences, an event capable of being perceived by those at the scene. The defense in question was a general denial. The other evidence of guilt presented at trial was abundant, including Blake's veritable confession in which he stated, "[M]y bad, my bad," when accused by Bess of shooting him as he fired at Brown. An application of the factors set forth in *Montgomery* and *Demery* in no way indicates that the trial court erred in its rulings.

¶33 There was no trial court error in the admission of the challenged testimony.

B

¶34 Moreover, although we determine that the challenged testimony was properly admitted, we additionally note that Blake failed to properly preserve these challenges for appeal. "[An] appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). "A party may assign evidentiary error on appeal only on a specific ground made at trial." *Kirkman*, 159 Wn.2d at 926; *accord* ER 103(a)(1).

¶35 Here, Blake failed to lodge a sufficiently specific objection at trial. Blake moved in limine to exclude impermissible opinions on guilt. However, in that motion, Blake specifically sought only to preclude Allen from testifying that Bess's and Hawthorne's initial accounts of the shooting to the police were consistent with each other. The court granted the motion. The motion did not specifically target the testimony with which Blake takes issue on appeal.

¶36 Furthermore, during trial, as the now-challenged testimony was being elicited, Blake interposed no objections resembling the challenges raised on appeal.[7] Thus, Blake failed to preserve the foregoing claims of error for appellate review, given that his pretrial motion to exclude improper opinion testimony was insufficiently general and that during trial he made no such objection at all.

¶37 Equally without merit is Blake's assertion that, even if the assignment of error on appeal was not properly preserved, it is nonetheless subject to appellate review pursuant to RAP 2.5(a)(3) because it constitutes a "manifest error affecting a constitutional right." Exceptions to RAP 2.5(a) are to be narrowly construed. *Montgomery*, 163 Wn.2d at 595. Manifest constitutional error requires a showing of "actual prejudice or practical and identifiable consequences." *Montgomery*, 163 Wn.2d at 595. "Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error." *Kirkman*, 159 Wn.2d at 936.

---

[7] Blake points to 13 instances in the trial record where supposedly improper opinion testimony was admitted. Blake objected to none of this testimony on the grounds discussed herein; instead, Blake claims that sufficient objections are "apparent from the record." Br. of Appellant at 23 n.16. In support of this claim, Blake cites to various objections he made at trial that did not pertain to impermissible opinions on guilt. *See, e.g.*, 1 Report of Proceedings (RP) at 54-59 (objecting to admission of the voice mail message as impermissible hearsay); 4 RP at 554-55 (objecting to Detective Allen's direct quotation of Williams's identification of Blake on the ground that Williams had not yet testified and the quotation constituted impermissible hearsay). RAP 2.5(a) does not envision as being properly preserved claims of error that are merely "apparent from the record." To the contrary, the standard is that an assignment of error must be based "on a specific ground made at trial." *Kirkman*, 159 Wn.2d at 926.

¶38 As discussed above, the testimony challenged herein included statements, in various forms, originating from two individuals who perceived through their own senses sufficient facts to each infer that Blake shot Brown. Their testimony did not parrot a legal standard, nor reference or use the word "guilt." Neither witness's testimony rose to the level of "explicit statement[s]" that Blake was guilty. *Kirkman*, 159 Wn.2d at 936.

¶39 "Important to the determination of whether opinion testimony prejudices the defendant is whether the jury was properly instructed." *Montgomery*, 163 Wn.2d at 595; *accord Kirkman*, 159 Wn.2d at 937. Proper instructions obviate the possibility of prejudice. Here, the jurors were instructed that they were the "sole judges of the credibility of each witness," "the sole judges of the value or weight to be given to the testimony of each," and were instructed to consider seven factors "[i]n considering a witness's testimony."[8] "There is no evidence that the jury was unfairly influenced, and 'we should presume the jury followed the court's instructions absent evidence to the contrary.'" *King*, 167 Wn.2d at 340 (Alexander, C.J., dissenting) (quoting *Montgomery*, 163 Wn.2d at 596).

¶40 Because prejudice cannot be established, RAP 2.5(a)(3) does not allow for appellate review.

¶41 Thus, Blake's failure to properly preserve the claims of error further supports affirmance.

---

[8] These factors were "the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome of the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony."

III

¶42 Blake next challenges certain testimony given by Detective Allen. We find no error in the admission of the challenged statements.

¶43 First, when asked by the prosecutor about Williams' identification of Blake in a photomontage, Detective Allen stated that Williams had made a "good pick." Later, when explaining why he did not investigate the underlying drug crime, the detective stated that such an investigation would have undercut the investigation of the murder, a more significant crime. In doing so, he referred to Blake as the "big fish."

¶44 Blake properly objected to the "big fish" comment. The trial court sustained the objection and instructed the jury to disregard that characterization of the defendant. The trial court correctly sustained the objection, and we presume that the jury followed the court's instruction. *State v. Carlson*, 61 Wn. App. 865, 877, 812 P.2d 536 (1991). Therefore, Blake cannot obtain appellate relief as a result of this statement.

¶45 By contrast, with regard to the "good pick" comment, the record indicates that Blake did not lodge an adequate objection.[9] Consequently, review of whether admission of this statement served as an endorsement of Williams' veracity as a witness, as claimed by Blake, is

---

[9] On direct examination, the State sought information about the photomontage used by the police to obtain Williams's identification of Blake as the shooter. The State requested that Detective Allen "describe for the jury exactly what it is that was told to Ivor Williams on the evening of June 25 regarding this photo array." After describing the procedure for using a photomontage to identify a suspect, Allen stated, "[W]e presented the montage. . . . He made a good pick." Blake did not object.

The State asked a follow-up question, seeking to elicit testimony as to Williams's comments, if any, when making the identification. Detective Allen replied, "[H]e said, 'this is the person who shot YG,' or, 'this is JG who shot YG.' " Blake promptly objected on hearsay grounds, reminding the trial court that Williams had not yet testified. The trial court sustained the objection. Several minutes later, the trial court took its lunch recess and excused the jury.

warranted only if the comment's admission constituted a manifest constitutional error. RAP 2.5(a)(3). Here again, the jury was properly instructed that it was the sole judge as to the credibility of witnesses and the weight to be given to each witness's testimony. The record contains no indication

---

Outside the presence of the jury, defense counsel addressed another issue with the court, that being whether complete discovery had been provided to the defendant. The following exchange took place:

[Defense]: Your Honor, I would also object because I don't believe I have ever heard that phrase used before that specifically Mr. Williams said this is the guy that shot YG.

[State]: Page 59 of discovery.

[Defense]: It doesn't have it in quotes. It appears to be a conclusion by Detective Allen in the sense that he writes in his report that he immediately chose Blake, and said that that was JG, and the person who shot YG. It's not in quotes and it doesn't appear to be a direct quotation.

Oftentimes, those things are written on the actual montage forms as to what the identification words are. Again, it doesn't appear on our copy of the photo montage either as the "words used."

Even outside of that, again, these are questions appropriately addressed with Mr. Williams, not with Detective Allen. Detective Allen has taken an opportunity to take a couple of unsolicited shots where Mr. Williams made a good pick, and some other information that just wasn't requested by [State's counsel], but certainly Detective Allen is getting in there.

[Court]: [State's counsel]?

[State]: Well, the reference to the good pick was probably inappropriate. I think the description of what the witness said when identifying the photograph is appropriate given the Evidence Rule.

[Court]: Well, this Rule is 801[(d)(1)(iii)]?

[State]: Correct.

[Court]: It's a statement of identification the person made at the proceeding is not hearsay. Looking at the comments to those rules, the rule applies only to a prior identification by a person who actually testifies as a witness. The objection here was that Mr. Williams has not yet testified.

[State]: Again, that's the order of proof issue that we were talking about. Williams is here. He will testify.

[Court]: When Detective Allen comes back, I guess, after Mr. Williams testifies, I think it would be proper. At this stage of the proceedings, I think under the rule it's improper.

The foregoing illustrates that Blake made no independent objection to the "good pick" comment. Moreover, the State invited an objection and request for relief by conceding that "the reference to the good pick was probably inappropriate." Nevertheless, Blake did not seek relief from the trial court. Blake's attorney was unquestionably aware of the potential for harm at that time, given the State's concession. Notwithstanding this, she sought relief only from the admission of the hearsay statement, and she additionally sought only to clarify an issue concerning the completeness of the discovery that she had been provided. Blake made no objection whatsoever on the ground now raised.

that the jury was unfairly influenced. Moreover, "we should presume the jury followed the court's instructions." *Montgomery*, 163 Wn.2d at 596. Hence, no "actual prejudice or practical and identifiable consequences" can be established. *Montgomery*, 163 Wn.2d at 595. Blake's claim of error is not entitled to appellate review.

## IV

¶46 Blake next asserts that Allen's testimony describing Bess's and Williams's identifications of Blake as the shooter constituted impermissible opinion testimony. Employing the same reasoning, he contends that Hawthorne's testimony about Bess's statement to her, identifying Blake as the shooter, was also impermissible opinion testimony. We disagree.

¶47 The challenged testimony constituted neither inferences nor opinions. Instead, the testimony consisted of witnesses perceiving an utterance by another person and then describing that perception to the jury. Such testimony is subject to the rules of evidence regarding its admissibility. The evidence was not, however, in any way opinion evidence.

## V

¶48 Blake next asserts that the trial court erred by permitting the voice mail recording to be played at trial. Blake contends that the declarant, Bess, did not have firsthand knowledge of the fact that he asserted—that Blake was the shooter—and that his statement was inadmissible hearsay. Because Bess did have direct knowledge of the fact that he asserted, this claim fails.

¶49 Blake brought a motion in limine to exclude the voice mail recording.[10] The trial court ruled that the content of the recording was admissible under both the excited utterance and present sense impression exceptions to ER 803.[11] Here, Blake does not challenge the application of the exceptions under ER 803; rather, he asserts that the declarant lacked firsthand knowledge of the fact asserted, rendering inclusion of the statement at trial erroneous.

¶50 "A trial court's determination that a hearsay exception applies is judged on an abuse of discretion standard." *State v. Magers*, 164 Wn.2d 174, 187, 189 P.3d 126 (2008). Regarding a trial court's ruling that a declarant possessed sufficient personal knowledge, "[ER 803] requires only that evidence 'sufficient to support a finding' of personal knowledge be introduced. . . . [T]estimony should be excluded only if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge." *State v. Vaughn*, 101 Wn.2d 604, 611-12, 682 P.2d 878 (1984) (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 219 (2d ed. 1982)).

¶51 It was uncontested that Bess was present at the scene of the shooting. Although he testified that he did not see the gun as it was being fired, he did testify as to the relative positions of the people at the scene at the time of the shooting. Importantly, he was hit in the neck by an ejected shell casing, indicating his close proximity to the gun as it was being fired. The trial court, in explicitly ruling

---

[10] Specifically, Blake argued that in response to being asked by Hawthorne, "Who shot? . . . Did Jay?" Bess's response, "yes," constituted hearsay to which no exception applied and was thus inadmissible. Br. of Appellant at 11.

[11] ER 803 provides:

(a) **Specific Exceptions.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(1) *Present Sense Impression.* A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

(2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

that two hearsay exceptions were satisfied by the circumstances surrounding Bess's exclamation in the voice mail, was properly satisfied that the circumstances surrounding Bess's testimony constituted evidence sufficient to support a finding of personal knowledge. *Vaughn*, 101 Wn.2d at 611-12. The fact that Bess did not actually see the bullet leave the gun, travel through the air, and pierce Brown's body does not indicate, "as a matter of law, [that] no trier of fact could reasonably find that [Bess] had firsthand knowledge." *Vaughn*, 101 Wn.2d at 611-12. The trial court did not abuse its discretion by admitting the evidence.

¶52 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

Cox and Verellen, JJ., concur.

Review denied at 177 Wn.2d 1010 (2013).