IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33983-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| RICHARD F. KLEPACKI, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| ANTHONY J. TUDOR, | ) | |
| | ) | |
| Defendant. | ) | |

LAWRENCE-BERREY, A.C.J. — Richard F. Klepacki appeals his conviction for first degree murder with a firearm enhancement. He claims that numerous errors below entitle him to a new trial. We disagree and affirm.

FACTS

*Background facts*

On January 4, 2014, at approximately 9:15 p.m., Gary Wright heard a loud knock on the front door of his friend Ed Giesbrecht's apartment in Deer Park, Washington. As Giesbrecht approached the door to open it, someone on the other side kicked it open and

off its hinges. Wright witnessed one person come through the doorway and fire one shot at Giesbrecht, killing him. Wright later described the shooter as a young stocky male, wearing a dark blue hoodie, baseball cap, and a blue bandana that covered his face.

Bernhard Dedicos was at the same apartment complex that night. He heard what sounded like fireworks. When he went outside he saw two men run by him. The men headed north and then turned east down an alley between C and D Streets. One of the two men appeared to have a pistol in his hand. When Dedicos learned that Giesbrecht had been shot, he called 911.

Deputy Robert Brooke responded to the call. As he was driving along C Street, he saw a man run into a wooded area. Deputy Brooke reported on the radio what he saw and pursued the man on foot. K-9 Deputy Steven Stipe assisted and found Klepacki lying face down in bushes near the entrance to Deer Park Middle School, one-fifth of a mile from Giesbrecht's apartment. Klepacki had blood on his face. The patrol dog found a nylon pistol holster in the bushes near Klepacki. The holster did not have snow or dew on it, indicating that someone had recently left it there.

Detective James Dresback interviewed Klepacki shortly after his arrest. The interview was recorded. During the interview, Klepacki admitted that he ran and hid when he saw law enforcement, and attributed his actions to "instinct." Clerk's Papers (CP) at 51. When told that he had blood on his face, Klepacki claimed the blood had

2

been there since New Year's Day, even though he had showered several times since then. He later said that he likely hurt himself when he hid from law enforcement. He denied that he owned a pistol and denied that the holster found near him belonged to him. He said he had been at his girlfriend Tracy Tudor's house that night and decided to go for a long walk. He claimed he had been walking alone for several hours that night. He denied going into any store that night. Soon after, Detective Dresback handed a receipt found in Klepacki's coat that showed he had purchased alcohol about an hour before the murder. Klepacki then admitted that he went to the store that night. Later, Klepacki denied being at the store. When reminded of the receipt, Detective Dresback asked Klepacki if he was at the store alone. Klepacki answered that he was alone.

Store surveillance video showed that around 8:00 p.m., Klepacki and Tracy Tudor's 23-year-old son, Anthony Tudor, were in the store. Klepacki was wearing a jacket, and Tudor had on a black hoodie. Klepacki had no blood on his face.

*Investigation*

Giesbrecht's front door had at least one visible footprint. A spent bullet was recovered in the drywall in the living room. A few days later, a shell casing was found.

Law enforcement obtained a search warrant to search 306 C Street, Tracy and Anthony Tudor's house. The address was approximately one block north of Giesbrecht's apartment. The search found a blue bandana, several baseball caps, and a pair of tennis

3

shoes with a tread pattern similar to the tread prints on Giesbrecht's front door. No pistol was found.

On January 23, 2014, Hazel McGillivary contacted law enforcement. Her son had directed her to a gun that had earlier been found by another child between B and C Streets near Deer Park Middle School. Law enforcement obtained the gun from McGillivary. It was a .45 caliber semi-automatic pistol.

Forensic examination of the evidence established that the .45 caliber pistol was the murder weapon. A forensic witness explained why deoxyribonucleic acid (DNA) and fingerprints would not be found on a pistol exposed to extreme cold and moisture for weeks. A forensic witness confirmed that the tread of the tennis shoes recovered at Tudor's house was similar to the tread prints on Giesbrecht's front door. A DNA analysis established that blood found on the coats of Tudor and Klepacki was Klepacki's blood.

*Procedural facts*

The State charged Klepacki and Tudor with first degree murder of Giesbrecht. The State later amended the charge to add the alternative charge of felony murder committed during the commission of first degree burglary. Klepacki filed a motion to sever the trials based on the fact that Tudor made incriminating statements that were prejudicial to Klepacki. The motion was unopposed, and the trial court severed the case into two trials.

Tudor's trial occurred first and resulted in his conviction for first degree murder.

His sister, Cheyeanne Woods, briefly testified at his trial. She denied having any

information about the murder.

*Klepacki's trial*

1.      *Lack of hearsay objection to McGillivary's testimony*

Klepacki's trial began October 26, 2015. During its case in chief, the State called

McGillivary. The State asked McGillivary what she did once the gun was brought to her.

McGillivary answered,

> Well, Logan, the eight—I think he was about ten at the time—a little boy
> found the gun and he brought it to the bus stop. Then my son run across the
> street and said, Mom, it's a real gun. So I took a bag and went over there
> . . . . And it was in the alley—in the gutter after Logan had dropped it there.

3 Report of Proceedings (RP) (Nov. 2, 2015) at 387. McGillivary then used a diagram

and showed the jury the alleyway and bus stop where she retrieved the gun. Klepacki did

not object during this testimony.

2.      *Hearsay objection to Detective Dresback's testimony*

The State also called Detective Dresback. The State asked the detective if he had

done any research about the holster, and he answered that he had. The State began to ask

Detective Dresback if he had consulted a firearms expert about the holster, and Klepacki

objected. However, Klepacki withdrew his objection and said he would wait until the

State finished its question. The State restated the question and asked Detective Dresback about his own research. Detective Dresback replied the holster, "[a]n Uncle Mike's holster No. 5 was designed to hold a firearm that is a large frame semi-automatic with a four-and-a-half to five-inch barrel, which was the kind of gun that was the murder weapon." 5 RP (Nov. 4, 2015) at 801.

The State then asked if Detective Dresback discussed that research with a firearms expert, and Detective Dresback responded that he had. The State asked the detective to relate that conversation, and Klepacki objected on the basis of hearsay. The State represented that the firearms expert had already testified about the holster and had been subject to cross-examination on the issue. The trial court agreed with the State and, believing that any confrontation clause issue was satisfied by the expert's earlier examination, overruled the objection. However, the record shows that neither party questioned the firearms expert about the holster.

>        3.      *Lack of hearsay objection to Detective Dresback's demonstration*

During Detective Dresback's redirect, the following colloquy occurred:

> [The State:] Detective, with respect to your interview with Mr. Wright, [did] Mr. Wright during that interview demonstrate for you how the shooter was holding the gun?
> [Detective Dresback:] Yes, he did.
> [The State:] And how that demonstration—I mean, what was the demonstration?

> [Detective Dresback:] He held his finger up like a gun in a fashion that he recalls seeing the shooter, he believed the shooter held the gun.
> [The State:] How did he demonstrate; what was it that you saw? Left hand, right hand?
> [Detective Dresback:] It was the right hand up over his shoulder, like this (indicating).

5 RP (Nov. 5, 2015) at 845-46. Klepacki did not object during this colloquy. Although Wright had earlier testified at trial, neither attorney asked him how the shooter had held the gun.

### 4. *Alleged prosecutorial misconduct*

Three days before Klepacki's trial began, the State notified Klepacki that Tudor's sister, Cheyeanne Woods, would testify against Klepacki. According to the State, Woods would testify that her brother called her about 15 minutes after the murder, was very emotional, and told her that Klepacki had just shot someone.

The State filed a motion seeking to have Woods's testimony deemed admissible. Klepacki objected. The trial court ruled that Woods could testify what her brother said, subject to the State laying a proper foundation for an excited utterance.

Defense counsel interviewed Woods on October 29, prior to her testifying. After this interview, and once the jury was excused, defense counsel voiced a concern. Counsel said he thought the State was committing prosecutorial misconduct in offering Woods's testimony to the jury. The court noted that defense counsel had not provided any

authority, briefing, or motion on the subject. Defense counsel said he would bring a CrR 8.3(b) motion to dismiss for misconduct. No such motion was brought.

Woods testified as anticipated. During her examination, Woods admitted that her new testimony was inconsistent with the testimony she gave in her brother's trial, that she told the State very recently she did not know anything about the murder, and that she spoke with her brother after that discussion with the State. Woods explained that she had withheld the substance of her brother's January 4 phone calls because her brother's claim at trial and in the pending appeal was that he was not present during the murder. She acknowledged that her present testimony hurt her brother's pending appeal.

The State presented call logs that verified Woods received calls from her brother the night of the murder, including a call around 9:30 p.m.

### 5. *State's theory explained*

The State explained its theory of the case during closing. The State argued that Tudor had kicked Giesbrecht's front door open and that Klepacki, standing behind and reaching over Tudor, fired the .45 caliber pistol. The State's theory therefore accounted for Tudor's shoe prints on the door, Wright's testimony that the shooter was a younger person wearing a dark hoodie and holding the pistol above his shoulder, and the fact that the gun's holster was found near Klepacki in the bushes.

### 6.    *Verdict and posttrial motions*

The jury found Klepacki guilty of first degree murder and entered a special finding that Klepacki had possessed a firearm at the time of the crime.  Klepacki filed a CrR 7.4(a)(3) motion for arrest of judgment, challenging the sufficiency of the evidence. The trial court denied that motion.

Klepacki also filed a CrR 7.5(a)(2) motion for a new trial, claiming prosecutorial misconduct.  Klepacki asserted that the prosecutor improperly offered leniency in exchange for Woods's testimony.  Klepacki's motion was based on defense counsel's affidavit.  Paraphrasing for brevity, the affidavit explained:

> After his conviction and sentencing, Tudor's attorney contacted the State and asked, "What will you give Tudor for coming forward and saying what happened?"  The State said it would listen to Tudor only if it could be corroborated.
> The State scheduled an interview with Tudor's sister and mom.  The interview occurred on October 15 and was videotaped.  The State asked both women how they felt about Tudor serving time for murdering Giesbrecht while the person who actually shot Giesbrecht, Klepacki, would probably go free.  The State also told them about the call it received from Tudor's attorney, and its response that it needed corroboration.  Both women adamantly insisted throughout the videotaped interview that they knew nothing.
> After the interview, Woods called her brother in prison.  After this call, she contacted the State and offered new information.  The State scheduled a second interview, although not recorded.  Woods told the State that her brother had called her shortly after the murder, sounded freaked out and scared, and told her that Klepacki had just shot and killed someone.

*See* CP at 163. The trial court considered defense counsel's affidavit and reviewed

Woods's October 15 videotaped interview. The trial court concluded that Klepacki had

not established prosecutorial misconduct and denied his CrR 7.5(a)(2) motion for a new

trial.

Klepacki appealed.

## ANALYSIS

Klepacki raises four arguments in his direct appeal: (1) the trial court abused its

discretion when it denied his CrR 8.3(b) motion to dismiss for prosecutorial misconduct,

(2) the trial court erred in admitting Detective Dresback's hearsay testimony that the

murder weapon could fit in the holster found near Klepacki, (3) he was denied effective

assistance of counsel when defense counsel failed to object to McGillivary's hearsay

statement about how the gun was found, and (4) he was denied effective assistance of

counsel when defense counsel failed to object to Detective Dresback's demonstration of

Wright's reenactment of how the shooter held the gun.

A.    PROCURING WOODS'S TESTIMONY WAS NOT PROSECUTORIAL MISCONDUCT

Klepacki argues the trial court abused its discretion when it denied his CrR 8.3(b)

motion to dismiss for prosecutorial misconduct. We note that Klepacki never brought a

CrR 8.3(b) motion to dismiss. Rather, Klepacki brought a motion for a new trial under

CrR 7.5(a)(2). The State does not raise this discrepancy as an issue. We treat Klepacki's

10

claim of error as pertaining to the trial court's denial of his motion for a new trial under

CrR 7.5(a)(2).

CrR 7.5(a)(2) authorizes a trial court to grant a defense motion for a new trial if it

appears that a substantial right of the defendant was materially affected by prosecutorial

misconduct. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). The decision to

grant or deny a new trial is within the discretion of the trial court, and this court will not

disturb that decision unless there is a clear abuse of discretion. *Id.* at 51. A trial court

abuses its discretion when no reasonable judge would have reached the same conclusion.

*Id.* at 52.

To show prosecutorial misconduct, the defendant has the burden of establishing

that (1) the State acted improperly, and (2) the State's improper act prejudiced the

defendant. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Misconduct is

prejudicial if there is a substantial likelihood it affected the verdict. *Id.* at 760-61.

Klepacki argues that the State acted improperly because it procured Woods's

testimony by offering leniency to someone else, her brother. Klepacki cites *United States

v. Singleton*, 165 F.3d 1297, 1301-02 (10th Cir. 1999) to support his argument. We do

not read *Singleton* as supporting his argument.

In *Singleton*, the government had promised a co-conspirator leniency in exchange

for the co-conspirator's testimony. *Id.* at 1298. The defendant appealed the lower court's

refusal to suppress the testimony. *Id*. at 1297. The defendant argued that the

government's offer to the witness violated the federal anti-gratuity statute.[1] *Id*. at 1299.

In rejecting the argument, the *Singleton* court stated:

> [T]he defendant implies Congress must have intended to subject the United
> States to the provisions of section 201(c)(2), and, consequently, like any
> other violator, to criminal prosecution. Reduced to this logical conclusion,
> the basic argument of the defendant is patently absurd.

*Id*. at 1300.

The *Singleton* court held that the longstanding practice of exchanging leniency for

truthful testimony was not prohibited under the anti-gratuity statute. *Id.* at 1302. The

*Singleton* court clarified that its holding did not permit the government to offer a witness

something beyond a concession normally granted:

> Our conclusion in no way permits an agent of the government to step
> beyond the limits of his or her office to make an offer to a witness other
> than one traditionally exercised by the sovereign. A prosecutor who offers
> something other than a concession normally granted by the government in
> exchange for testimony is no longer the alter ego of the sovereign and is
> divested of the protective mantle of the government. Thus, fears our
> decision would permit improper use or abuse of prosecutorial authority
> simply have no foundation.

---

[1] 18 U.S.C. § 201(c)(2) provides that whoever corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person with intent to influence the testimony under oath of such first-mentioned person as a witness upon a trial shall be fined under this title or imprisoned for not more than two years, or both.

*Id.*

Klepacki asserts that *Singleton* prohibits the State from offering leniency to anyone but the witness, i.e., Woods. We disagree. *Singleton* was concerned with *what* the government offered, not *who* might benefit from the government's offer. *Singleton* focused on the type of concession the government offered and concluded that the longstanding governmental practice of exchanging leniency for testimony was not improper.

Here, the record does not establish that the State offered leniency to Woods's brother. But even if the State did offer leniency to him, it is of no consequence. We conclude that the trial court did not abuse its discretion when it denied Klepacki's CrR 7.5(a)(2) motion for a new trial.[2]

> B.   ADMITTING HEARSAY TESTIMONY ABOUT THE HOLSTER WAS HARMLESS
>       ERROR
>
>       1.   *Hearsay*

---

[2] After oral argument, Klepacki filed a "Memorandum Re Statement of Additional Authorities." In the two-page memorandum, Klepacki clarifies his prosecutorial misconduct argument. We understood his argument without the need for clarification. The State has moved to strike the memorandum as an improper post-argument submission. We agree and grant the State's motion to strike.

Klepacki argues the trial court erred in admitting Detective Dresback's testimony that the firearms expert confirmed to him that the .45-caliber pistol could fit inside the holster found near Klepacki.

The State does not dispute that Detective Dresback's testimony was hearsay. The State instead argues that Klepacki failed to object. We disagree. Klepacki did object. But the trial court allowed the testimony because it wrongly believed the firearms expert had already testified on the issue. Regardless of whether the firearms expert had earlier testified on the issue, the detective's recitation of the expert's opinion still was hearsay.

The trial court, therefore, erred by admitting Detective Dresback's hearsay testimony.

The State alternatively argues that admission of the hearsay was harmless. We agree. Error in admitting hearsay may be harmless if there is a reasonable probability that the error did not materially affect the verdict. *State v. Owens*, 128 Wn.2d 908, 914, 913 P.2d 366 (1996). Here, Detective Dresback testified about his own research and stated that his research confirmed that the .45-caliber pistol could fit inside the holster. This was proper nonhearsay testimony. An error is not prejudicial if similar testimony was admitted. *State v. Ramirez-Estevez*, 164 Wn. App. 284, 293, 263 P.3d 1257 (2011).

### 2. *Confrontation clause*

Klepacki further argues that the admission of the hearsay statement violated his rights under the confrontation clause. Under the Sixth Amendment to the United States Constitution's confrontation clause, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witness against him." In general, the confrontation clause prohibits the admission of an unavailable declarant's out-of-court statement if the hearsay qualifies as testimonial. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

The parties present a thorny issue of whether Klepacki's failure to assert a specific confrontation clause objection waives his right to review. The issue presented is thorny given that the trial court glossed over the hearsay objection and focused on the confrontation clause when it erred in admitting the evidence.

We note that both the .45-caliber pistol and the holster were in the courtroom throughout most of the trial. The hearsay statement of Detective Dresback did not prevent Klepacki from confronting his absent accuser. The best evidence of whether the absent accuser's opinion was true was available to Klepacki within the four walls of the courtroom. If there was a bona fide question whether the pistol fit the holster, the question could have been irrefutably answered without resort to any absent witness. One only would have had to place the pistol inside the holster. For this reason, we reject

15

Klepacki's claim that the admission of the hearsay violated his rights under the

confrontation clause.

C.    COUNSEL NOT INEFFECTIVE FOR FAILING TO OBJECT TO MCGILLIVARY HEARSAY

Klepacki argues he received ineffective assistance of counsel when his attorney

failed to object to McGillivary testifying where a child had originally found the murder

weapon.  We disagree.

To meaningfully protect an accused's right to counsel, an accused is entitled to

effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,

80 L. Ed. 2d 674 (1984).  Courts apply a two-prong test to determine if counsel provided

effective assistance: (1) whether counsel performed deficiently, and (2) whether the

deficient performance prejudiced the defendant.  *Id.* at 687.  If a defendant fails to

establish one prong of the test, this court need not address the remaining prong.  *State v.*

*Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).  This is a mixed question of law

and fact, reviewed de novo.  *Strickland*, 466 U.S. at 698.

To satisfy the first prong, the defendant must show that, after considering all the

circumstances, counsel's performance fell below an objective standard of reasonableness.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  The burden is on the

defendant to show deficient performance.  *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d

1260 (2011). This court gives great deference to trial counsel's performance and begins

the analysis with a strong presumption counsel performed effectively. *State v. West*, 185

Wn. App. 625, 638, 344 P.3d 1233 (2015). A counsel's failure to object to evidence is a

classic example of trial tactics; only in egregious circumstances will it constitute deficient

performance. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989).

McGillivary explained that she retrieved the murder weapon and called police

because a child had found a gun near the school and dropped it in an alleyway nearby at a

bus stop. By testifying that a child had originally found the gun near the school, it places

the gun closer to where law enforcement found Klepacki.

Had Klepacki raised a hearsay objection, the State would have been required to

call the boy who found the gun as a witness. Having a boy testify that he found a gun on

the way to school would not have benefited Klepacki. It would have emphasized the

danger a gun poses. We determine that defense counsel's failure to object to

McGillivary's testimony was a legitimate tactical decision.

D.  COUNSEL NOT INEFFECTIVE FOR FAILING TO OBJECT TO DETECTIVE
DRESBACK'S DEMONSTRATION OF WRIGHT'S PORTRAYAL OF HOW SHOOTER
HELD GUN

Klepacki contends he received ineffective assistance of counsel when his attorney

failed to object to Detective Dresback's demonstration of Wright's portrayal of how the

shooter held the gun. The State does not dispute Klepacki's valid contention that the

17

detective's demonstration constitutes nonverbal hearsay.  *See, e.g.*, *In re Dependency of Penelope B.*, 104 Wn.2d 643, 652, 709 P.2d 1185 (1985).  Instead, the State obliquely argues that defense counsel's lack of objection was a legitimate trial strategy.  With the following explanation, we agree.

In closing, the State argued Klepacki was the shooter largely based on Detective Dresback's demonstration of how Wright portrayed to him the shooter holding the gun above his shoulder.  The State argued that Wright saw Tudor because Tudor was in front and that Wright saw the gun over Tudor's shoulder because Klepacki was reaching over Tudor with the gun.

Klepacki countered the State's argument in his closing:

> Shot over the shoulder?  What did Mr. Wright say, shot over the shoulder?  Did you hear Mr. Wright say anything like that when he's giving his observations about the shooter?  Where did that come from, a shot over the shoulder?  Did you hear any testimony about that in here?  Detective Dresback tried to say something to that effect, but it wasn't from a witness.

5 RP (Nov. 5, 2015) at 947.

Klepacki, by not objecting to Detective Dresback's demonstration, allowed him to argue that the evidence of how the shooter held the gun was unbelievable because the evidence did not come from a witness to the shooting.  This is a classic example of trial tactics, the kind we will not second-guess absent extreme circumstances.  This is not an extreme circumstance.  Defense counsel's closing argument on this point was sufficiently

18

No. 33983-1-III
*State v. Klepacki*

sound to not warrant reversal.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

RAP 10.10 permits a defendant to file a pro se statement of additional grounds for

review (SAG) if the defendant believes his appellate counsel has not adequately

addressed certain matters.  RAP 10.10(d) directs that the defendant should file his SAG

within 30 days of receiving his appellate counsel's brief and notice of the substance of

rights and obligations under RAP 10.10.

Here, Klepacki's appellate counsel mailed the appellant's brief to Klepacki and

notified him of the substance of RAP 10.10 on December 12, 2016.  Klepacki filed his

first SAG on February 13, 2017 (raising 21 distinct arguments in his 5 grounds for

review) and his supplemental SAG on July 25, 2017.  We deem the supplemental SAG in

substantial violation of RAP 10.10(d) and address only those issues raised in the

February 13, 2017 SAG.[3]

SAG Ground 1:

  A. *Bias of judge/charging in the alternative*

Klepacki asserts, "Bias application of discretion and failing to protect the rights of

the defendant, thereby handicapping the defense by allowing the state a wide latitude with

---

  [3] We nevertheless reviewed the issues raised in the July 25, 2017 SAG and
conclude they lack merit.

19

and to objections to the prosecution." SAG at 1. Klepacki's assertion does not inform us

of the nature and occurrence of the claimed error. We, therefore, decline to review it.

*State v. Clark-El*, 196 Wn. App. 614, 625, 384 P.3d 627 (2016).

Klepacki also complains that the court allowed the State to charge him by

alternative means, which prevented him from knowing the exact nature of the charges.

CrR 2.1(a)(1) permits charging in the alternative. Klepacki fails to explain how the

charges were confusing. His mere assertion that the information was confusing is

insufficient to warrant our review.

### B. *Improper instructions*

Klepacki argues the instructions were improper and confused the jury. But we will

not review a claimed instructional error in the absence of a preserved objection at trial.

*State v. Hickman*, 135 Wn.2d 97, 104-05, 954 P.2d 900 (1998). Here, Klepacki did not

object or take any exception to the trial court's instructions.

SAG Ground 2:

### 1A. *Prosecutorial misconduct: Charging decision*

Similar to his argument above, Klepacki argues the prosecutor committed

misconduct because he did not know what statute to charge. Because the law permits

charging in the alternative, we reject Klepacki's argument of prosecutorial misconduct.

### 1B. *Prosecutorial misconduct: Prosecuting a knowingly false case*

Klepacki argues that the prosecutor committed misconduct by prosecuting a case against him that the prosecutor knew was false. Klepacki points to the October 15 videotaped interview in which the prosecutor told Woods that Klepacki might not be convicted. This statement does not establish that the prosecutor knew the case against Klepacki was false. Up until Woods's testimony, the State's case against Klepacki relied on circumstantial evidence. The State had a store video that showed Klepacki and Tudor together shortly before the murder. The State also had a witness who saw *two* men, one with a gun, running away from the murder scene soon after the shooting. In addition, a deputy who responded to the call saw Klepacki running in the opposite direction from the murder scene and found a freshly placed gun holster near where Klepacki was hiding. The evidence does not support Klepacki's argument that the prosecutor knew the case against Klepacki was false.

### 2A. *Prosecutorial misconduct: Giving testimony during closing*

Klepacki argues that the prosecutor committed misconduct during closing arguments by testifying how the events happened on January 4. We disagree. The prosecutor used the evidence admitted during trial to argue how the crime likely occurred. For instance, although no one actually testified that Klepacki reached over Tudor to shoot Giesbrecht, the evidence did permit the argument to be made. The jury was free to

believe or disbelieve the State's various arguments. To assure that the conviction was based only on evidence admitted during the trial, and not on the lawyers' arguments, the trial court instructed the jury:

> The lawyers' remarks, statements and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. . . . You must disregard any remark, statement or argument that is not supported by the evidence or the law in my instructions.

5 RP (Nov. 5, 2015) at 909. We presume that the jury followed the court's instructions. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). Because the prosecutor's arguments were not evidence, but instead were arguments based on trial testimony, we reject Klepacki's claim that the prosecutor committed misconduct by testifying.

### 2B. *Prosecutorial misconduct: Explanation of Klepacki's injury*

Klepacki argues the prosecutor committed misconduct by telling the jury during closing argument that he cut his head by either being hit with the gun or running into a guide wire. Again, the trial court explained to the jury that the attorneys' statements during closing are not facts and any statements not supported by the evidence should be disregarded. If the prosecutor's statements to the jury were not supported by the evidence, we presume that the jury followed the court's instructions and disregarded the argument. *Id.*

22

### 2C.     *Prosecutorial misconduct: How shooter held gun*

Klepacki argues the prosecutor committed misconduct by misstating the testimony how Wright described the shooter holding the gun. Klepacki claims that Wright described the shooter as holding the gun at shoulder level, not above the shoulder. As noted above, if the evidence did not support the prosecutor's argument, we presume the jury disregarded it. Also, the jury was permitted to believe Detective Dresback's description of how Wright portrayed the shooter.

### 2D.     *Prosecutorial misconduct: Argument that Klepacki admitted that holster fell out of his pocket*

Klepacki argues the prosecutor committed misconduct by misstating that Klepacki admitted to Detective Dresback that the holster fell out of his pocket. Klepacki argues the evidence clearly showed that he said his cell phone may have fallen out of his pocket. We presume the jury disregarded the prosecutor's misstatement of the record. Nevertheless, the evidence showed that the holster had been recently discarded in the vicinity where Klepacki was hiding from law enforcement. The jury could have reasonably believed that Klepacki discarded the holster.

SAG Ground 3:

### 3A.     *Ineffective assistance of counsel: Failure to file suppression motion*

Klepacki argues he received ineffective assistance of counsel because his counsel's "failure to file a motion for a [CrR] 3.6(a) Suppression of Evidence Hearing." SAG at 3. We are unable to determine what Klepacki believes should have been suppressed. Because we are unable to determine the nature of the claimed error, we will not review it.

### 3B. *Ineffective assistance of counsel: Failure to object at trial*

Klepacki argues he received ineffective assistance of counsel because his attorney did "[n]ot object[ ] to any of the evidence the state admitted during trial." SAG at 3. The record refutes Klepacki's argument. Defense counsel objected throughout the entire trial.

### 3C. *Ineffective assistance of counsel: Not hiring forensic expert*

Klepacki argues he received ineffective assistance of counsel because his attorney did not provide "forensic expert for defense rebuttal to state's findings and testimony." SAG at 3. Klepacki does not explain whether the evidence he thinks should have been challenged relates to the gun, the shoes, the holster, or the DNA evidence. Because we are unable to determine the nature of the claimed error, we will not review it.

### 3D. *Ineffective assistance of counsel: Detective Lyle Johnston's speculation*

Klepacki argues he received ineffective assistance of counsel because his attorney did not ask the trial court to strike Detective Johnston's speculation that a guide wire

24

could have caused Klepacki's head injury. Here, the trial court sustained defense counsel's objection that Detective Johnston's opinion was speculation, but did not explicitly tell the jury to disregard the evidence. Nevertheless, the trial court instructed the jury to not consider evidence that was stricken or "not admitted." 5 RP (Nov. 5, 2015) at 907. Again, we presume the jury followed the trial court's general instruction.

### 3E. *Ineffective assistance of counsel: Not objecting at closing*

Klepacki argues he received ineffective assistance of counsel because his attorney failed to object to the prosecutor's description of how the shooter held the gun. Here, there was an issue of fact. Detective Dresback testified that Wright portrayed to him that the shooter held the gun above his shoulder. Defense counsel was not deficient for failing to object to an argument supported by the record.

SAG Ground 4:

### 4A/B. *Irrelevant evidence: Lack of DNA/prints on gun*

Klepacki argues the trial court erred when it admitted irrelevant evidence that forensics did not recover his or Tudor's DNA/prints on the gun. Klepacki did not object to this testimony. He, therefore, waived his right to review on this issue. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985); *see also State v. Blake*, 172 Wn. App. 515, 530, 298 P.3d 769 (2012).

### 4C/D. *Irrelevant evidence: Clothing not worn by him*

Klepacki argues the trial court erred when it admitted irrelevant evidence of pictures of hats and the bandana from Tudor's residence because there was no evidence that he wore the hat or the bandana on the night of the murder. Again, Klepacki did not object to this testimony. He, therefore, waived his right to review on this issue. *Blake*, 172 Wn. App. at 530.

### 4E. *Irrelevant evidence: Nike shoes*

Klepacki argues the trial court erred when it admitted the Nike shoes because forensic evidence was inconclusive about whether the tread print matched the prints on the victim's front door. Klepacki's failure to object to this evidence precludes our review. *Id.*

### 4F. *Irrelevant evidence: Holster*

Klepacki argues the holster was irrelevant because there was no evidence linking him to the holster. We disagree. The holster was recently placed where he was hiding from law enforcement. A jury could draw the reasonable inference that Klepacki hid the holster.

SAG Ground 5: *Brady*[4] violation

Klepacki argues the State violated *Brady* by refusing to admit into evidence his boots or that he was wearing them. The record does not support this argument.

*Brady* imposes a duty on the State to disclose material evidence favorable to the defendant. *See Brady*, 373 U.S. at 87. If the State suppresses such evidence, this violates due process regardless of whether the State acted in good faith or bad faith. *Id*. To establish a *Brady* violation, a defendant must demonstrate the existence of each of three necessary elements: (1) the State must have suppressed the evidence, either willfully or inadvertently, (2) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching, and (3) prejudice must have ensued such that there is a reasonable probability that the result of the proceeding would have differed had the State disclosed the evidence to trial counsel. *State v. Mullen*, 171 Wn.2d 881, 895, 259 P.3d 158 (2011). A defendant's *Brady* claim fails if he or she fails to demonstrate any element. *Id*.

As to the first element, the State elicited testimony that Klepacki was wearing boots when Detective Dresback interviewed him. The State also admitted an exhibit that showed Klepacki wearing boots the night of his interview. The State did not suppress any evidence. We, therefore, reject Klepacki's claim that the State committed a *Brady*

---

[4] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

No. 33983-1-III
*State v. Klepacki*

violation.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____          _____
Siddoway, J.                                              Pennell, J.