IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 78849-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZACHARY DAMIEN CRAVEN, | ) | PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Jurors should reach a verdict based upon the evidence presented at trial and the law provided by the court. Because this process should be based in reason and logic, a prosecutor makes an improper closing argument by emphatically inviting jurors to rely on their emotions and moral sense as well as their intellect when reaching a verdict. Although Zachary Craven demonstrates the State's closing argument was improper, he fails to show it was prejudicial in view of the trial court's timely oral instruction to the jury that the application of the law to the facts is "an intellectual, not an emotional decision."[1] Retrial is not required.

Craven's remaining issues also do not warrant any relief on appeal. Therefore, we affirm.

---

[1] Report of Proceedings (RP) (May 23, 2018) at 2434.

FACTS

Robert Luxton and Angelika Hayden were in a close relationship for decades and raised Hayden's biological grandson, Zachary Craven. Craven called Luxton "grandpa" and Hayden "mom." As Craven got older, his relationship with Hayden deteriorated. In 2013 and again in April of 2015, Craven pleaded guilty to domestic violence felony harassment for threatening to kill Hayden. He then moved in with Luxton, who no longer lived with Hayden.

On July 1, 2015, Luxton saw Craven come into their house from the garage and inject something into his arm. Luxton had never seen Craven use drugs like that before. Craven then took out an old .22 caliber pistol Luxton kept in the garage, put it to Luxton's temple, and said, "I will kill you."[2] Although scared, Luxton said, "No, you won't."[3] Craven hit Luxton's temple with the gun.

On July 7, Luxton went to check on Hayden at home because she was not answering her phone. The front door was ajar, and he saw Hayden slumped over the coffee table in her living room. The television was on. He saw blood and a shell casing from a .22. Hayden had been shot once in the right temple, killing her.

That same day, Theresa Cunningham and her parents flew back to Washington after a vacation to Indiana. They were supposed to be picked up from the airport by Meagan Smith, who was one of Cunningham's best friends

_____

[2] RP (May 1, 2018) at 622.

[3] Id.

and who had been house-sitting for them.  Smith was not at the airport or answering her cell phone, so Cunningham's uncle drove them home.  No lights were on in the house, even though it was around 11:00 pm.  The front door was locked, and Smith had their keys.  Cunningham and her father walked to the back door.  It was open.  Cunningham used her cell phone as a flashlight as they walked into the house.  She saw Smith's body on the kitchen floor and began to scream.  Smith had been shot once in the head, killing her.  A shell from a .22 was on the floor.  They fled from the house.  Cunningham called 911 and said her ex-boyfriend, Zachary Craven, had killed Smith.

After responding to the Cunningham home, Renton Police Officer Christopher Reyes brought Cunningham and her parents to the station for an interview.  About 10 minutes into his interview with Cunningham, her phone rang. She put the phone on speaker and, in a clear voice, she and Officer Reyes heard Craven say, "I'm in trouble.  I need help.  Come meet me alone."[4] Craven said he was at a drugstore in downtown Renton.  Officer Reyes told dispatch where to find him.

Officer Dave Adam was on patrol around 1:00 a.m. when the call went out to detain Craven as a person of interest in Smith's death.  Officer Adam found Craven waiting outside the drugstore.  He called Craven's name and ordered him to lie on the ground.  Craven dropped the bag he was holding, put up his hands, and began to walk away.  After Craven ignored several more

---

[4] RP (May 3, 2018) at 892.

orders to stop, Officer Gary Berntson tased and arrested him. Officer Berntson took Craven to the police station and then to the hospital because Craven complained of pain in his wrists. Craven's blood was drawn at the hospital, and it tested positive for methamphetamine and traces of opiates.

The State charged Craven with second degree assault and two counts of first degree murder. Craven entered pleas of not guilty, made a general denial to the charges, and raised a mitigating theory of voluntary intoxication. The State moved to admit documents Craven wrote and gave to an inmate, who then provided them to the police. The court admitted the documents but reserved ruling on admitting the inmate's police interview because the inmate refused to testify. The State also moved to admit dozens of pieces of evidence under ER 404(b), and Craven moved to sever the charges against him. The court admitted some of the ER 404(b) evidence and denied the motion to sever.

In his opening statement, Craven admitted to killing Hayden and Smith but argued it was not intentional or premeditated. Over the lengthy trial, 44 witnesses testified, including more than 20 police officers and 7 scientists with the Washington State Patrol crime laboratory. During closing argument, the prosecutor argued, "[T]he law is rooted in our . . . common intellectual sense [and] common moral sense. What that means is that if we apply the law to the evidence in this case, and if we follow the law, we will reach the correct verdict. And it should feel right when you do so."[5] He repeatedly emphasized "it should

---

[5] RP (May 23, 2018) at 2434.

feel right" in the head, heart, and gut when applying the law to the facts to find Craven guilty.[6]  After the jury found him guilty, the court sentenced Craven to 72 years' incarceration.

Craven appeals.

<u>ANALYSIS</u>

<u>I.  Prosecutorial Misconduct</u>

"A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."[7]  Prosecutors represent the public, including defendants, and have a duty to see that fair trial rights are not violated.[8]  Prosecutors must "'seek convictions based only on probative evidence and sound reason.'"[9]  A prosecutor acts improperly by seeking a conviction based upon emotion rather than reason.[10]  Reversal is required if the improper conduct prejudiced the defendant.[11]

---

[6] <u>Id.</u> at 2434-44, 2455-56, 2507-08.

[7] Rules of Professional Conduct (RPC) 3.8 cmt. 1.

[8] <u>State v. Monday</u>, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) (citing <u>State v. Case</u>, 49 Wn.2d 66, 71, 298 P.2d 500 (1956)).

[9] <u>In re Glasmann</u>, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting <u>State v. Casteneda-Perez</u>, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)).

[10] <u>State v. Echevarria</u>, 71 Wn. App. 595, 598, 860 P.2d 420 (1993) (quoting <u>State v. Huson</u>, 73 Wn.2d 660, 663, 440 P.2d 192 (1968)); <u>see</u> <u>Glasmann</u>, 175 Wn.2d at 712-13 (reversing convictions obtained by prosecutor's prejudicial appeals to emotion).

[11] <u>State v. Warren</u>, 165 Wn.2d 17, 26, 195 P.3d 940 (2008).

Craven alleges the prosecutor's closing argument prejudiced him.  We review allegations of prosecutorial misconduct for an abuse of discretion.[12]  We review the argument within the context of the trial as a whole.[13]  Craven bears the burden of proving the prosecutor's argument was both improper and prejudicial.[14]

During closing arguments, the prosecutor equated having a verdict "feel right" or "make sense" emotionally and morally with applying the law to the facts of the case:

> [PROSECUTOR]:  Members of the jury, the law isn't supposed to be mystic.  It's supposed to represent us as a society. It's our shared beliefs, our shared understandings, our shared morals.  The law is simply a codification of those things, and that's what you have before you in the form of those jury instructions.  At first blush they may seem wordy, confusing, complicated. But if you take the time to actually read them, think about them, you will see that they make sense.  It's because the law is rooted in our shared common intellectual sense, the law is rooted in our shared common moral sense.

> [DEFENSE]:  I'm going to object, Your Honor.  Improper argument.

> COURT:  Objection overruled.

> [PROSECUTOR]:  Common intellectual sense, common moral sense.  What that means is that if we apply the law to the evidence in this case, and if we follow the law, we will reach the correct verdict.  And it should feel right when you do so.

---

[12] State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)).

[13] In re Gentry, 179 Wn.2d 614, 631, 316 P.3d 1020 (2014) (citing State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

[14] Lindsay, 180 Wn.2d at 430 (citing Warren, 165 Wn.2d at 26).

[DEFENSE]: Objection, Your Honor.

COURT: Objection overruled. Jury will apply the law to the facts. The law is what is contained in my instructions. The facts are the evidence, which the jury finds to have been proven and established. It is an intellectual, not an emotional decision, but that is the process that will be used.

[PROSECUTOR]: If we follow the law, we will reach the correct verdicts. If you follow the law, you will reach the correct verdicts. And when do you that, it will feel right here intellectually.

[DEFENSE]: Objection, Your Honor, to characterization of the feeling right here.

COURT: The objection is overruled. Your objection is noted.

[PROSECUTOR]: It will feel right here intellectually [indicating the head]. Remember our shared common intellectual sense. It will feel right here morally [indicating the heart], our shared common moral sense. That's the law, and it should feel right here [indicating the gut or stomach].[15]

[DEFENSE]: Objection, Your Honor.

COURT: The objection is noted.

[PROSECUTOR]: And that's because the law makes sense. It makes sense here, and it makes sense here, and it makes sense here. (Indicating.)

. . . .

. . . The defendant must be found guilty of assault in the second degree for pistol whipping Luxton on the 2nd. The defendant must be found guilty of murder in the first degree for the premeditated killing of his 66 year old grandmother Angelika Hayden. The defendant must be found guilty of murder in the first degree for the premeditated killing of 21 year old Meagan Smith.

---

[15] During a sidebar, defense counsel expanded on his objection and noted the prosecutor touched his head, heart, and gut or stomach when arguing where "it feels right." RP (May 23, 2018) at 2457.

7

These are the only conclusions that make sense. These are the only verdicts that make sense.

[DEFENSE]:  Objection, Your Honor.

COURT:  Objection overruled.

[PROSECUTOR]:  When you consider the evidence, and you follow the law, these verdicts make sense. They make sense here. (Indicating.) They make sense here. (Indicating.)

[DEFENSE]:  I'm going to object again.

[PROSECUTOR]:  And they make sense here (Indicating.).

Thank you.[16]

Craven argues this argument was improper because it asked the jury to come to a decision based equally upon what feels right intellectually in the head, emotionally in the heart, and viscerally in the gut.  The State concedes the prosecutor's argument was "inartful" but contends he was not asking the jury to base their verdict on emotion.

Read as a whole, the prosecutor told the jurors they would know Craven's guilt beyond a reasonable doubt by, in equal measure, recognizing it intellectually and feeling it emotionally in their hearts and viscerally in their guts. Equating "common intellectual sense" with "common moral sense,"[17] invited jurors to give the same weight to their rationality as to their emotions and instincts.  By arguing "only [guilty] verdicts make sense" when also arguing the

---

[16] Id. at 2433-35, 2455-56.

[17] Id. at 2434, 2435.

law must "make sense" in the head, heart, and gut,[18] the prosecutor told jurors

that arriving at a guilty verdict was as much emotional as intellectual. This can

be understood only as an appeal to considerations other than the reasoned,

intellectual application of law to facts. It risked a conviction based upon

reasons other than the evidence.[19]

> The prosecutor tried to blunt the impact of this theme in rebuttal:
>
> > PROSECUTOR: Let me set something else straight. [Defense] [c]ounsel accused me of asking you or suggesting that you convict based on morals or a gut feeling. It's an example of overselling. It's taking my comments out of context. What I reminded you repeatedly was to apply the facts and the evidence to the law. The law makes sense because it's rooted in our intellect and our morals. And when you apply the facts to the evidence, it should feel right.
> >
> > DEFENSE: I'm going to object again, Your Honor.
> >
> > COURT: Objection overruled.
> >
> > PROSECUTOR: Not just do whatever feels right. That's a different argument. And let's be clear, I said it should feel right because it makes sense. I never felt that—I never said that you should feel good about it. I never said you should feel bad about it. The point was if you follow the law and apply the evidence to the law, you will reach the right conclusion.[20]

Despite the prosecutor's belated attempt, his core theme remained the same:

each juror should feel right intellectually, emotionally, and instinctually when

---

[18] Id. at 2455-56.

[19] Matter of Det. of Urlacher, 6 Wn. App. 2d 725, 748, 427 P.3d 662 (2018) (citing State v. Ramos, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011)), review denied sub nom., In re Det. of Urlacher, 192 Wn.2d 1024, 435 P.3d 276 (2019).

[20] RP (May 23, 2018) at 2507-08 (emphasis added).

applying the law to the facts.  He is incorrect.  As a judicial officer, the

prosecutor should have understood that following and applying the law will not

always feel right emotionally or instinctually.  In fact, as the court instructed,

jurors are court officers with an obligation to set aside their biases and

intellectually apply the law to the facts even if the result is personally distasteful

or disappointing.[21]  The prosecutor urged the jury to rely upon their emotions

and instincts when weighing the facts alleged.  It was improper for the

prosecutor to insist a juror should "feel right" and have a decision "make sense"

in the heart and in the gut when reaching a verdict.[22]

The State cites State v. Curtiss[23] to support the propriety of closing

argument because "a criminal trial's purpose is a search for truth and justice."[24]

In Curtiss, the court approved of the prosecutor's closing argument that

because a trial is "a search for the truth and a search for justice," the jury should

---

[21] See RCW 4.44.260 (a juror's duty is to reach a verdict "according to the law and evidence as given them on the trial"); see also 11 WASHINGTON PRACTICE, PATTERN JURY INSTRUCTIONS: CRIMINAL 1.02, at 22 (4th ed. 2016) ("As jurors, you are officers of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference."); cf. In re Pers. Restraint of Yates, 177 Wn.2d 1, 30, 296 P.3d 872 (2013) (the right to trial by jury "is violated by the inclusion on the jury of a biased juror, whether the bias is actual or implied") (citing Morgan v. Illinois, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992)).

[22] We recognize that closing arguments in a criminal trial often involves facts that can excite emotion.  A prosecutor is not compelled to ignore such facts.  But arguing from facts that are inherently emotional is distinct from arguing for reliance upon emotion to decide a fact.

[23] 161 Wn. App. 673, 250 P.3d 496 (2011).

[24] Resp't's Br. at 39 (citing id. at 701).

"[c]onsider all the evidence as a whole" and convict if "you know in your gut . . . you know in your heart that Renee Curtiss is guilty as an accomplice to murder."[25]  The court reasoned "a criminal trial's purpose is a search for truth and justice.  Accordingly, the State's gut and heart rebuttal arguments in this case were arguably overly simplistic but not misconduct."[26]  The court recited that the prosecutor's single, fleeting "heart and gut" argument did not appeal to emotion, but it did not explain its reasoning.  It also explained no prejudice would have resulted because the jury followed the court's standard instruction not to base its decision on sympathy, prejudice, or personal preference, and that Curtiss, who did not object to the argument, failed to show an additional jury instruction could not have cured any error.[27]

We disagree with Curtiss's conclusion that a "heart and gut" argument is not an appeal to emotion.  A jury should reach its verdict based upon the evidence presented at trial, not each juror's preferences or feelings in their heart or gut.  Because the prosecutor's argument here emphatically and expressly invited jurors to use their emotions and visceral instincts equally with their intellect when reaching a verdict, closing argument was improper.[28]  The search for justice is not consistent with this "heart and gut" appeal to emotion.

---

[25] Curtiss, 161 Wn. App. at 701.

[26] Id. at 702.

[27] Id.

[28] When considering allegations of prosecutorial misconduct, our Supreme Court has taken judicial notice of other cases in which that prosecutor has made the same argument.  Warren, 165 Wn.2d at 27 n.4.  Thus, we note our concern

However, Craven fails to show the argument was prejudicial. Before closing argument, the court provided the standard jury instruction explaining each juror must "reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference."[29] More significantly, after the prosecutor's first insistence that a correct verdict should "feel right," the court correctly instructed the jury:

> COURT: [The] jury will apply the law to the facts. The law is what is contained in my instructions. The facts are the evidence, which the jury finds to have been proven and established. <u>It is an intellectual, not an emotional, decision</u>, but that is the process that will be used.[30]

This curative instruction reminded the jury of its duties and, having been given so timely, shaped the jury's understanding of the rest of the prosecutor's closing argument,[31] significantly limiting any prejudicial impact.

---

that the same prosecutor has made the same closing argument in other cases, almost word-for-word. <u>E.g.</u>, <u>State v. Bacani</u>, No. 76371-7, slip op. at 16-18 (Wash. Ct. App. June 18, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/763717.pdf; <u>State v. Berhe</u>, No. 75277-4, slip op. at 21-23 (Wash. Ct. App. Feb. 5, 2018), (unpublished), http://www.courts.wa.gov/opinions/pdf/752774.pdf, <u>rev'd on other grounds</u>, 193 Wn.2d 647, 444 P.3d 1172 (2019). <u>Bacani</u> is distinguishable because the defendant did not object this argument appealed to emotion. No. 76371-7, slip op. at 15-22. We decline to adopt the reasoning in <u>Berhe</u> because it relies solely upon <u>Curtiss</u> to conclude this argument was proper. No. 75277-4, slip op. at 22-23.

[29] CP at 464.

[30] RP (May 23, 2018) at 2434 (emphasis added).

[31] <u>See</u> <u>State v. Stein</u>, 144 Wn.2d 236, 247, 27 P.3d 184 (2001) ("We presume that juries follow all instructions given.") (citing <u>Degroot v. Berkley Constr., Inc.</u>, 83 Wn. App. 125, 131, 920 P.2d 619 (1996)).

Citing State v. Perez-Mejia[32] and State v. Allen,[33] Craven insists this instruction failed to cure any prejudice because the court also overruled his objections. Perez-Mejia is not apt because the trial court there did not provide a curative instruction after overruling the defendant's objection to an improper closing argument.[34] Allen is also inapposite. There, the prosecutor repeatedly misstated the law during closing argument, the court overruled the defendant's objections without providing a curative instruction, and the jury's questions during deliberation showed it had been misled.[35] Because the court here correctly stated the law when providing a curative instruction, we presume the jury followed the court's instructions,[36] and nothing suggests the jury was misled, Craven fails to show prejudice from closing argument.

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

---

[32] 134 Wn. App. 907, 143 P.3d 838 (2006).

[33] 182 Wn.2d 364, 341 P.3d 268 (2015).

[34] 134 Wn. App. at 917-18.

[35] 182 Wn.2d at 371-80.

[36] Stein, 144 Wn.2d at 247.

## II. Evidence Admitted Under ER 404(b)

Craven challenges eight pieces of evidence admitted pretrial under ER 404(b) to prove he intentionally killed Smith. He argues the evidence was not admitted for a proper purpose or was unduly prejudicial.

We review the court's interpretation of ER 404(b) de novo and review a decision to admit evidence for an abuse of discretion.[37] A trial court abuses its discretion when its decision rests on untenable grounds or was made for untenable reasons.[38] Evidence admitted under ER 404(b) may never be used to demonstrate a defendant's propensity to act in a certain way, but it may be admitted for any other purpose.[39] Before admitting evidence of a prior bad act, a court must (1) find by a preponderance of the evidence that the act occurred, (2) determine whether the evidence is relevant to prove an element of the crime charged, (3) identify a proper purpose for admitting the evidence, and (4) weigh the probative value of the evidence against any prejudicial effect.[40] The court must conduct the analysis on the record and provide a limiting instruction to the jury.[41]

---

[37] State v. Arredondo, 188 Wn.2d 244, 256, 394 P.3d 348 (2017) (citing Diaz v. State, 175 Wn.2d 457, 461-62, 285 P.3d 873 (2012); State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012)).

[38] Id. (quoting State v. Mason, 160 Wn.2d 910, 922, 162 P.3d 396 (2007)).

[39] Gresham, 173 Wn.2d at 420-21.

[40] Arredondo, 188 Wn.2d at 257 (quoting Gresham, 173 Wn.2d at 421).

[41] Id. (citing State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007)). Craven insinuates the court failed to properly consider the ER 404(b) evidence before admitting it. Appellant's Br. at 56, 63. The record does not

Craven does not contest the first two factors, whether the acts occurred or were relevant.[42] Thus, we must determine, first, whether admitting the evidence to show Craven's intent was permissible,[43] and second, whether the evidence was sufficiently probative of motive and intent to avoid being unfairly prejudicial.

The court admitted each piece of evidence as probative of Craven's motive and intent to control and harm Cunningham and Meagan Smith.[44] Evidence can be admitted under ER 404(b) to prove motive and intent. A defendant's motive is "what prompted [him] to take criminal action."[45] "Evidence of a defendant's motive is relevant in a homicide prosecution."[46] "[E]vidence of quarrels and ill-feeling may be admissible to show motive, and evidence of prior threats is also admissible to show motive or malice if the evidence is of

_____

support him. In addition to a lengthy discussion and series of oral rulings on the evidence, see RP (Apr. 6, 2018) at 278-326 (discussing and ruling on proffered ER 404(b) evidence), the court entered conclusions addressing each of the required factors. See CP at 139-67 (written ruling on ER 404(b) evidence). Craven fails to show the court did not consider the required factors.

[42] Appellant's Br. at 54-66.

[43] Craven does not contest the evidence was admissible to demonstrate motive. See Appellant's Br. at 65.

[44] E.g., CP at 148 (trial court explaining its reasons for admitting one of the six pieces of evidence).

[45] Arredondo, 188 Wn.2d at 262 n.7 (citing State v. Tharp, 96 Wn.2d 591, 597, 637 P.2d 961 (1981)).

[46] State v. Stenson, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997) (citing State v. Pirtle, 127 Wn.2d 628, 644, 904 P.2d 245 (1995); State v. Osborne, 18 Wn. App. 318, 325, 569 P.2d 1176 (1977)).

consequence to the action."[47]  A defendant's intent is "what the defendant hopes to accomplish when motivated to take action."[48]  A defendant's intent may be inferred from all the circumstances of a case, including the nature of the parties' relationship and any previous threats.[49]

The State argues Craven had an abusive, controlling relationship with Cunningham and this motivated his intent to act on threats he made against her and those close to her.  Craven does not challenge the court's decision to admit threats he made to Cunningham in the fall of 2014:

> If I have to look on your phone and go on your Facebook to find someone else you're talking to, I WILL hurt you so bad you will wish you were dead, I swear to God, Theresa.

> If you even mention breaking up with me tomorrow, I will send you [your dog's] head.  [T]he one thing you love most.  I will fucking send you [your dog's] head.  I swear to fucking God, Theresa.  So are you?

> If you threaten to call the cops one more time I'll go after your friends.  Not bottom up, but start at the top.  Marla?  Meagan?[50]

Craven challenges three pieces of evidence from a trip he took in April 2015 to visit Cunningham at Gonzaga University.  During that visit, Craven accused Cunningham of cheating on him, threw a glass at her, and assaulted her.  Cunningham used her phone to photograph her injuries and concealed

---

[47] Id. at 702 (citing State v. Powell, 126 Wn.2d 244, 260, 893 P.2d 615 (1995)).

[48] Arredondo, 188 Wn.2d at 262 n.7 (citing Powell, 126 Wn.2d at 261).

[49] State v. Yarbrough, 151 Wn. App. 66, 86-87, 210 P.3d 1029 (2009) (quoting State v. Wilson, 125 Wn.2d 212, 217, 883 P.2d 320 (1994)).

[50] CP at 143-45.

them from Craven because he would check her phone. He sent a contrite text message after the assault: "I will die before I ever hurt [you] again. . . . [B]ut [you] can't do this for me without me asking you to do something. Don't wonder [why] I get mad at [you] for that."[51] This all demonstrates Craven's intent to act on his desire to control Cunningham through violence and emotional manipulation. This evidence is also probative of intent because it can rebut Craven's voluntary intoxication defense.

Craven challenges three pieces of evidence from the final days of his relationship with Cunningham. On June 3, 2015, Craven again accused Cunningham of cheating on him and made her strip off her clothes to prove she had no marks on her body showing infidelity. He then punched her in the chest and threatened to kill her by holding up two bullets and saying "pick which one you want."[52] On June 7, Cunningham went to a baseball game with her friends and met Craven afterwards. He accused her of cheating, took out a gun, pointed it at her head, and physically assaulted her. The next morning, Cunningham confided in a family friend about the abuse and revealed her injuries. This evidence is probative of Craven's motive and intent because it shows his need to possess Cunningham and his willingness to exert control through threats and violence. This is also probative of intent because it can rebut Craven's voluntary intoxication defense.

---

[51] CP at 149.
[52] CP at 153.

17

Craven challenges two pieces of evidence about taking Cunningham's dog. On June 16, 2015, after the breakup, Cunningham refused to see Craven, and then he went to her house and took her dog, a German Shepherd. On July 5, Craven visited a friend and asked if he could leave a German Shepherd with her. This evidence is also probative of Craven's intent to act deliberately on threats made to control Cunningham.

In State v. Arredondo, our Supreme Court upheld a trial court's admission of evidence under ER 404(b) to prove the motive and intent of a gang member charged as an accomplice to second degree murder and assault from a drive-by shooting.[53] The victims were all members of a rival gang.[54] The court concluded the evidence of a past drive-by committed by the gang member against that same rival gang showed his motive, deep-seated animosity toward the rival gang, and his intent to act with extreme violence when faced with his rivals.[55] Like the gang member, Craven's history of threats and related violence were probative of his need to control Cunningham and his intentional use of violence to do so. And like Arredondo, the State sought admission of these eight pieces of evidence under ER 404(b) to prove intent, not mere propensity. Craven fails to show the trial court erred.[56]

---

[53] 188 Wn.2d 244, 249-50, 394 P.3d 348 (2017).

[54] Id. at 250-51.

[55] Id. at 259-61.

[56] Craven also contends the court erred by admitting evidence under ER 404(b) to show identity. But identity was still a material issue when the court admitted this evidence pretrial. See CP at 45-46 (Craven entering a

Craven argues the evidence was not sufficiently probative to outweigh its prejudicial effect. "Evidence is unfairly prejudicial when it is likely to stimulate an emotional response instead of a rational decision."[57] Merely being prejudicial to the defendant does not make it unfair.[58] In City of Auburn v. Hedlund, for example, our Supreme Court concluded a 911 recording was unfairly prejudicial to a defendant charged as an accomplice to vehicular homicide where the content of the recording was inaccurate, exaggerated the severity of the car crash, and was offered merely to prove a fact "well-established" by other evidence.[59] And the 911 caller's "gruesome" description was not germane to the crime charged.[60] In State v. Pirtle, by contrast, the court concluded gruesome crime scene and autopsy photos were not cumulative or unfairly prejudicial to a defendant charged with first degree murder and felony murder.[61] Some photographs were very similar, but none

---

defense of general denial in his trial brief); RP (Apr. 6, 2018) at 213 (arguing general denial and intoxication defense the day of oral argument on the motion to admit evidence). Craven abandoned his general denial defense on the first day of trial, after the court admitted the ER 404(b) evidence. See RP (Apr. 30, 2018) at 478-79 (Craven admitting to killings in his opening statement); CP at 167 (court's written ruling of April 23, 2018, admitting evidence). He did not renew his objections to the evidence after changing his defense. He fails to show the court abused its discretion.

[57] State v. Scherf, 192 Wn.2d 350, 388, 429 P.3d 776 (2018) (citing State v. Beadle, 173 Wn.2d 97, 120, 265 P.3d 863 (2011)).

[58] Id. (citing State v. Read, 100 Wn. App. 776, 782, 998 P.2d 897 (2000)).

[59] 165 Wn.2d 645, 648, 656, 201 P.3d 315 (2009).

[60] Id.

[61] 127 Wn.2d 628, 635, 655, 904 P.2d 245 (1996).

were duplicative.[62] Each photograph provided a distinct view, such as how a victim had been wounded or where they had been attacked. The photographs were probative of premeditation because they helped to establish the sequence of the attacks and how the wounds were inflicted.[63] Although the photographs were "potentially inflammatory" because they were "gruesome," that risk was unavoidable because crime itself was "gruesome and horrible."[64]

Craven contends the evidence of abuse was cumulative and, therefore, unduly prejudicial. As in Pirtle, none of the admitted evidence was duplicative of any other. Each act of abuse was distinct and probative of Craven's motive and intent. For example, evidence that Craven threatened Cunningham's life by putting a gun to her head after she socialized without him was probative of premeditation by showing his strategic use of deadly threats to control her. Evidence he stole her dog after the breakup was probative of premeditation, showing his willingness to target others to control her.[65] Each act was probative of whether Craven acted with premeditation when he killed Smith because acts

---

[62] Id.

[63] Id. at 644-45, 653-55.

[64] Id. at 655.

[65] Craven also asserts the theft of Cunningham's dog was unfairly prejudicial because it was an "overt act of violence," Appellant's Br. at 62-63, but he mischaracterizes the evidence. The court did not admit evidence Craven harmed Cunningham's dog. Indeed, the evidence showed Craven kept the dog for several weeks and was trying to give it away. See CP at 159, 166-67. Although the jury could have inferred Craven killed the dog based on his threats and the fact it never came home, the jury could have as easily inferred he found someone to take the dog.

20

of past violence by the defendant against one victim can be probative of the defendant's intent to harm another victim in related circumstances.[66]  Craven's history of threats and subsequent acts were highly probative of his motive and intent in a case where the State had the burden of proving premeditated intent. Craven does not show the court abused its discretion.[67]

III.  ER 404(b) Limiting Instruction

Craven assigns error to jury instruction 28, the limiting instruction for prior bad act evidence admitted to prove he killed Smith with premediated intent.  The instruction restricted how the jury could consider eight months of misconduct, but it did not restrict the jury's ability to consider misconduct from the two months before the crime.  Craven's counsel drafted and proposed the instruction.  The instruction provided:

---

[66] See Arredondo, 188 Wn.2d at 249-50, 260 (evidence of a prior, uncharged drive-by shooting committed by a gang member charged as an accomplice to second degree murder in a different drive-by shooting of a rival gang was probative of the defendant's motive and intent because it showed his level of animosity toward rival gang members); Pirtle, 127 Wn.2d at 649-50 (a robber's past conviction for a Montana felony assault was probative of motive and intent in a Washington aggravated murder case because his motive for killing the witnesses of his Washington robbery originated in the existence of the Montana felony assault charges); State v. Boot, 89 Wn. App. 780, 789, 950 P.2d 964 (1998) (in an aggravated first degree murder case for killing a woman, affirming the admission of evidence showing the defendant held a gun to the head of a different woman two days earlier and was mocked as being too weak to pull the trigger, giving him the motive and intent to kill someone).

[67] Craven argues his prior acts of domestic violence against Cunningham are inadmissible because she was not the victim of the charged crimes.  But Craven fails to explain why evidence of a defendant's past violence targeting a romantic partner cannot be probative of the defendant's motive or intent to harm another person connected to that partner.

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony related to
>
> misconduct by the defendant toward Theresa Cunningham between September of 2014 and April of 2015. You may consider this evidence as to motive, intent, and premeditation for [killing Smith]. You may not consider this evidence as to [assaulting Luxton] or [killing Hayden]. Except as indicated in Instruction 35, you may not consider this evidence for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.[68]

A. Invited Error

As a threshold matter, the State argues the invited error doctrine bars consideration of this issue. "'A party may not request an instruction and later complain on appeal that the requested instruction was given.'"[69] This is a strict and inflexible rule[70] that bars review even where the defendant proposes an instruction in good faith and matters outside his control render it incorrect.[71]

Craven argues State v. Gresham created an independent duty for a trial court to provide a defendant's proposed ER 404(b) limiting instruction after altering it to correctly state the law.[72][73] But he misreads Gresham. There, the

---

[68] CP at 492 (emphasis added).

[69] State v. Studd, 137 Wn.2d 533, 546, 973 P.2d 1049 (1999) (quoting State v. Henderson, 114 Wn.2d 867, 870, 792 P.2d 514 (1990)).

[70] Id. at 547 (citing Henderson, 114 Wn.2d at 872).

[71] See City of Seattle v. Patu, 147 Wn.2d 717, 720-21, 58 P.3d 273 (2002) (concluding the invited error doctrine barred review where the ordinance on which the defendant based his instruction was later held unconstitutional).

[72] 173 Wn.2d 405, 269 P.3d 207 (2012).

[73] Craven relies on an unpublished case, State v. Moreno-Valentin, 190 Wn. App. 1022, 2015 WL 5724962 (2015), to support his position, but the case

trial court admitted evidence under ER 404(b), and the defendant's attorney proposed a limiting instruction that incorrectly stated the law.[74] The trial court rejected the instruction because it was incorrect but failed to give any limiting instruction.[75] The court stated, "At least in the context of ER 404(b) limiting instructions, once a criminal defendant requests a limiting instruction, the trial court has a duty to correctly instruct the jury, notwithstanding defense counsel's failure to propose a correct instruction."[76] It explained a defendant should not be held to have waived the right to a limiting instruction by proposing an incorrect one.[77] It did not address the circumstances here, where the trial court provided the defendant's proposed instruction.

Because the trial court in Gresham rejected the defendant's instruction, the invited error doctrine was not applicable and not addressed. Nor did the court give any indication it was overruling decades of invited error precedent by creating an exception specific to ER 404(b). Indeed, such an exception would be incongruous with more recent Supreme Court decisions holding that the invited error doctrine can preclude review of alleged errors of constitutional magnitude.[78]

---

is inapposite. The defendant in Moreno-Valentin did not request the erroneous limiting instruction. Id. at *5.

[74] Gresham, 173 Wn.2d at 424.

[75] Id.

[76] Id.

[77] Id. at 424-25.

[78] See, e.g., Matter of Pers. Restraint of Salinas, 189 Wn.2d 747, 754, 757-58, 408 P.3d 344 (2018) (holding the invited error doctrine barred review of a defendant's allegation of a public trial violation).

Craven agrees he proposed and the court adopted the portion of instruction 28 he now argues was erroneous.[79] The invited error doctrine bars Craven from assigning error to the very language he proposed.[80] We decline to review this alleged error.

### B. Ineffective Assistance of Counsel

Craven argues his counsels were ineffective for proposing jury instruction 28. We review a claim of ineffective assistance of counsel de novo.[81] The defendant bears the burden of proving ineffective assistance of counsel.[82] First, the defendant must prove his counsel's performance was deficient.[83] Second, the defendant must prove his counsel's deficient performance prejudiced his defense.[84] Failure to prove either deficiency or prejudice ends the inquiry.[85] A defendant must overcome "'a strong presumption that counsel's performance was reasonable.'"[86] When defense

---

[79] See Appellant's Br. at 68 ("[Defense] [c]ounsel proposed the instruction except for the reference to Instruction 35.").

[80] Patu, 147 Wn.2d at 721 (quoting Studd, 137 Wn.2d at 546).

[81] State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009) (citing In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610 (2001)).

[82] State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984)).

[83] Id. at 32 (quoting Strickland, 466 U.S. at 687).

[84] Id. at 33 (quoting Strickland, 466 U.S. at 687).

[85] State v. Woods, 198 Wn. App. 453, 461, 393 P.3d 886 (2017) (citing State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996)).

[86] Grier, 171 Wn.2d at 33 (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).

counsel's decisions "can be characterized as legitimate trial strategy or tactics, performance is not deficient."[87]

Craven concedes that his trial counsels made a strategic choice when proposing the limiting instruction but contends the decision was not legitimate. The jury instruction prohibited the jury from considering misconduct from September of 2014 through April 2015 to decide whether Craven intentionally assaulted Luxton and killed Hayden, implicitly allowing consideration of misconduct from May, June, and July of 2015 for any purpose. Craven's trial strategy was to contend only that he was incapable of forming premeditative intent due to a downward spiral of drug addiction and not contest attacking Luxton or killing Hayden and Smith. The jury could have found Craven guilty of only lesser offenses had it accepted his theory.

During opening statement, defense counsel asserted Craven was experiencing a "deterioration," becoming "incoherent" and having "delusional, irrational thinking that was increasing" such that he "was absolutely delusional by the time" he attacked his victims.[88] He expressly invited testimony about misconduct after April 2015 to prove his theory. For example, defense counsel invited testimony from one witness to prove Craven regularly used methamphetamine and heroin in June and July of 2015 and would suddenly

---

[87] Kyllo, 166 Wn.2d at 863.

[88] RP (Apr. 30, 2018) at 487-89.

became violent when under the influence.[89]  He also cross-examined Cunningham about Craven's increasing violence and drug use through May, June, and July of 2015, asking if his behavior was a "consistent straight line down" during those months.[90]  During closing, defense counsel argued Craven's increasingly irrational, impulsive, and violent behavior in May, June, and July of 2015 was due to drug abuse.[91]  The jury could have concluded heroin and methamphetamine use gave Craven a propensity for irrational, rather than intentional, violence when he attacked Luxton, Hayden, and Smith.  Defense counsel made a legitimate, strategic decision to avoid conviction on the most serious charges by showing and letting the jury infer Craven's propensity for irrational violence when using drugs in the months leading to his crimes.  Because defense counsels' decisions were legitimate and strategic, Craven fails to demonstrate they were ineffective.

IV.  Severance

Craven argues the trial court abused its discretion when it denied his pretrial motion to sever and when it denied his renewed, half-time motion to sever.  We review a trial court's denial of a motion to sever for abuse of

---

[89] See RP (May 8, 2018) at 1377-81.

[90] RP (May 14, 2018) at 1910.

[91] RP (May 23, 2018) at 2466-71 (arguing Craven's behavior in May, June, and July of 2015 was a "descent" into impulsive violence and irrationality due to drug use).

discretion.[92] Severance is appropriate where the defendant demonstrates that holding a single trial is "'so manifestly prejudicial'" that it "'outweigh[s] the concern for judicial economy.'"[93] To determine whether a single trial would cause undue prejudice, we weigh "'(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.'"[94] Even if evidence of separate charges would not be cross admissible in separate trials, severance is not required.[95]

Because we consider only the facts known to the trial court at the time it evaluated a severance motion, we first evaluate the court's denial of Craven's pretrial motion to sever and then consider his renewed motion.[96]

---

[92] State v. Nguyen, 10 Wn. App. 2d 797, 814, 450 P.3d 630 (2019) (citing State v. Bythrow, 114 Wn.2d 713, 717-18, 790 P.2d 154 (1990)), review denied sub nom. State v. Thanh Pham Nguyen, 195 Wn.2d 1012, 460 P.3d 178 (2020).

[93] Id. (quoting Bythrow, 114 Wn.2d at 718).

[94] State v. Bluford, 188 Wn.2d 298, 311-12, 393 P.3d 1219 (2017) (quoting State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)).

[95] State v. Kalakosky, 121 Wn.2d 525, 538, 852 P.2d 1064 (1993) (citing State v. Markle, 118 Wn.2d 424, 439, 823 P.2d 1101 (1992); Bythrow, 114 Wn.2d at 720).

[96] See Bluford, 188 Wn.2d at 310 ("[W]here we are reviewing only pretrial joinder, we review only the facts known to the trial judge at the time, rather than the events that develop later at trial.").

A.  Pretrial Denial of Severance

For the first factor, Craven does not argue the evidence was weak on either murder charge.  Although he argues evidence of the murder charges "were not equally strong" as evidence of the assault charge,[97] a review of the record shows the evidence on each charge was compelling.  For the second factor, he concedes his assertion of the same defenses to all three charges, general denial and voluntary intoxication, did not support severance.[98]  For the third factor, Craven asserts the jury would have been unable to follow the court's instruction to consider each charge separately.[99]  But we presume a jury will follow the instructions provided absent evidence to the contrary,[100] and the court planned to provide the jury with an instruction to consider each charge separately.[101]  The critical factor here is the fourth: cross admissibility of the evidence between the assault and murder charges and between each murder charge.

Craven argues evidence related to the gun and evidence of him being driven to the two killings was not cross admissible between the charges.  He

---

[97] Appellant's Br. at 33.

[98] See id. (explaining "[t]he court noted, and defense counsel agreed, there was no conflict in the defenses).

[99] Id. at 34-35.

[100] State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007) (citing State v. Davenport, 100 Wn.2d 757, 763, 675 P.2d 1213 (1984); State v. Cerny, 78 Wn.2d 845, 850, 480 P.2d 199 (1971)).

[101] RP (Apr. 6, 2018) at 228.

admits "the firearm-related evidence, including forensic analysis, provided a basis for the State to argue that the gun used to assault Luxton was the gun used to kill Smith and Hayden."[102]  He contends, however, that this firearm evidence had little probative value, making it unfairly prejudicial and inadmissible because other evidence showed Craven possessed a .22 caliber gun.  He also argues evidence Jorge Lopez drove him to Hayden's house and then to Cunningham's house would not have been cross admissible because it was not relevant to the assault on Luxton.

Before Craven changed his defense, the State still had to prove he shot Hayden and Smith.  Forensic evidence showed the same gun was used in all three crimes.  Luxton's testimony about being assaulted with that specific .22 was highly probative of identity because it connected Craven with the murder weapon.[103]  And with intent and premeditation at issue, Lopez's testimony would have been probative and cross admissible to the murder charges because he could testify about Craven's requests to be driven to Hayden's house and Cunningham's house on the day of the murders.  He could also

---

[102] Appellant's Br. at 37.

[103] Craven contends other witnesses could link him to the gun, making Luxton's testimony less probative.  But other witnesses provided conflicting evidence, describing the gun by color or size rather than caliber.  Only one other witness, Michael Garcia, could testify he saw Craven with a .22 caliber gun around the time of the killings.  The presence of one other witness who could connect Craven to that caliber of weapon does not reduce the probative value of Luxton's testimony so low as to render it unfairly prejudicial.

rebut Craven's mitigation theory by testifying about his demeanor the day of the killings.

Although evidence about the killings would not necessarily have been admitted in a separate trial on the assault charge, severance is not required merely because some evidence is not cross admissible.[104] Indeed, an entire criminal charge may not be cross admissible, and a court is still not obligated to sever the charge.[105] Testimony about the gun, including Luxton's, would have been cross admissible for all three charges, and Lopez's testimony was probative of intent for both murders. Because the factors predominantly favored trying the charges together, Craven fails to show the court abused its discretion.

### B. Denial of Severance During Trial

CrR 4.4(b) allows severance when "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." Accordingly, a defendant may raise a motion to sever after trial has begun to address "[a]ny prejudice that emerges over the course of the trial."[106] Craven argues the court abused its discretion when it denied his renewed motion to sever. He asserts none of the ER 404(b) evidence previously

---

[104] Kalakosky, 121 Wn.2d at 538.

[105] Bythrow, 114 Wn.2d at 720.

[106] Bluford, 188 Wn.2d at 310 (citing CrR 4.4(a)(2)).

admitted remained cross admissible because he changed his strategy, contesting only intent and not identity.

The four factors did not favor severance. The court instructed the jury to consider each charge separately.[107] Craven asserted the same voluntary intoxication defense to all three charges. Severing the murder charges would have required repeating testimony from 18 witnesses, of the 44 total, who either investigated both killings or, like Luxton, could address the voluntary intoxication defense by testifying about Craven's behavior when on drugs. And if the State also called the arresting officers who personally observed Craven's behavior in the hours following Smith's killing, then 22 of the 44 witnesses called would have testified at both trials. All of the ER 404(b) evidence admitted pretrial to show the identity of Hayden's killer was also admitted to show the motive, intent, or knowledge of Smith's killer, and remained cross admissible for those purposes. Declining to contest identity eliminated the risk of prejudice from the jury improperly inferring Craven committed one act of violence because he committed another. Considering the factors as a whole, Craven fails to show a manifest prejudice compelling severance.

IV. Improper Opinion Testimony

We review an allegation the court admitted improper testimony for abuse of discretion.[108] A court abuses its discretion if it admits opinion testimony that

---

[107] See CP at 465.

[108] State v. Blake, 172 Wn. App. 515, 523, 298 P.3d 769 (2012) (citing State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001)).

embraces the ultimate issue in a trial and is not otherwise admissible.[109]  A lay

witness's opinion about a witness's demeanor is admissible, even if it goes to

the ultimate issue, when based upon their personal observation of the

defendant.[110]  Because improper opinion testimony violates the defendant's

right to a trial by jury, we review improper admission of opinion testimony under

the constitutional harmless error standard.[111]  Reversal is required unless the

State can prove beyond a reasonable doubt that any reasonable jury would

have reached the same result absent the error.[112]  If the untainted evidence

was so overwhelming the jury necessarily would have found the defendant

guilty, then the error was harmless.[113]

Craven contends Detective Peter Montemayor, the lead detective on

Smith's death, prejudiced him by giving improper opinion testimony.  The

primary issue at trial was whether Craven acted with the requisite intent.

---

[109] State v. Quaale, 182 Wn.2d 191, 197, 340 P.3d 213 (2014) (citing ER 704).

[110] See State v. Rafay, 168 Wn. App. 734, 808, 285 P.3d 83 (2012) (citing cases) ("Washington courts have repeatedly found [opinions about a defendant's demeanor] admissible when based on a proper foundation of factual observations that directly and logically support the witness's conclusion."); City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993) (concluding a police officer's opinion that went to an ultimate issue for the jury was admissible when "based solely on his experience and his observation").

[111] Quaale, 182 Wn.2d at 201-02.

[112] Id. (citing State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 889 (2002)).

[113] Scherf, 192 Wn.2d at 371.

Montemayor testified for the State four times during the trial. The fourth time he took the stand, Montemayor and the prosecutor had the following exchange:

Q: Although Ms. Hayden's homicide is not your specific investigation, is it fair to say that you are familiar with that investigation?

A: I am familiar with it, yes.

Q: Familiar with the autopsy findings?

A: Yes.

Q: Reviewed all this video evidence?

A: Yes.

Q: Based on your investigation, the accompanying investigation that you were part of and also made aware of, are you aware of any evidence, any evidence to show that Mr. Craven's killing of Angelika Hayden was not intentional?

[DEFENSE]: Your Honor, this is an improper question.

COURT: What?

[DEFENSE]: This is ultimately for the jury.

COURT: Objection sustained.

Q: Did you find any actual evidence of Mr. Craven being intoxicated at the time of Angelika Hayden's murder or homicide?

A: No. Just being in possession of narcotics upon arrest.

Q: Any evidence that during the time of Angelika Hayden's homicide that Mr. Craven was so intoxicated he could not form intentional acts?

[DEFENSE]: Your Honor, . . . I'm going to object to this. This is an ultimate question for the jury.

COURT: I'm going to allow this question.

A: I have not seen any of that evidence, no.

Q: Are you aware of any actual evidence that Mr. Craven was so intoxicated at the time of Ms. Smith's killing that he was not capable of committing that act intentionally?

A: No.

[DEFENSE]: I'm also going to have –

COURT: I'm going to sustain this objection. [T]he jury will disregard.

Q: Any actual evidence that Mr. Craven at the time of Meagan Smith's homicide was so intoxicated that he was not capable of forming or committing an intentional act?

[DEFENSE]: Your Honor, I'm going to object both on it's an ultimate question and also on speculation based upon the question.

COURT: Alright. I will allow this, but I do want to caution the jury that ultimately it will be the jury's determination, based on all the evidence received in the courtroom, to determine whether Mr. Craven is responsible for any of these crimes.

Q: Are you aware of any such evidence?

A: No.[114]

Assuming Montemayor gave an improper opinion, the question is whether the error was harmless.

The State argues Montemayor's testimony was not necessary to establish premeditated intent because testimony from other witnesses established that Craven could act intentionally when he attacked Luxton,

---

[114] RP (May 17, 2018) at 2363-65.

Hayden, and Smith.  Unlike Montemayor, the other witnesses who testified

about Craven's intent had seen his demeanor and based their testimony upon

personal observations.  Cunningham testified Craven's several assaults on her,

including hitting her and pointing a gun at her head, were intentional.[115]  Luxton

testified Craven acted intentionally when putting a gun to his head, threatening

to kill him, and striking him with the gun.[116]  Lopez, who drove Craven to

Hayden's house the day of her killing, testified Craven gave turn-by-turn

directions to her house.[117]  Lopez also testified Craven gave him turn-by-turn

directions to from Hayden's house to Cunningham's house.[118]  Douglas Beaton

was Hayden's neighbor.  Beaton spoke with Craven after he left her house on

the afternoon of her killing.[119]  Beaton testified Craven had no trouble walking,

no trouble speaking, and no trouble getting into a vehicle.[120]  Officer Berntson,

who helped arrest Craven and is a certified emergency medical technician and

trained combat medic, testified Craven's uncooperative behavior around the

arrest was intentional despite him being high on heroin.[121]  Officer Adam, who

helped arrest Craven and was an emergency medical technician and firefighter

---

[115] RP (May 14, 2018) at 1933-34.

[116] RP (May 1, 2018) at 631-32.

[117] RP (May 8, 2018) at 1285-87.

[118] Id. at 1289, 1293-95.

[119] RP (May 7, 2018) at 1085-90.

[120] Id. at 1092-93.

[121] RP (May 3, 2018) at 987, 1002-03.

before his career as a police officer, testified Craven did not appear to be too intoxicated to act without intent.[122] Officer Reyes, who heard Craven speak with Cunningham the night of the killings, testified Craven's speech was confident and not slurred.[123] Most notably, the prosecutor asked Officer Corey Jacobs, a 29-year veteran police officer who also helped arrest Craven, a series of questions, like those posed to Montemayor, about whether Craven could act intentionally on the night of the killings:

> Q: Was there anything that led you to believe that during that observation that [Craven's] decision to walk backwards and keep and eye on [the drugstore] or look toward that [drugstore], that was not a purposeful or intentional action?
>
> A: No, sir.
>
> . . . .
>
> Q: When that person turned, you said, saw your vehicle, and then you described the path in which this person took. Anything about that period of time you observed this individual, anything for you to believe that those actions were not purposeful or intentional?
>
> A: No, sir.
>
> . . . .
>
> Q: When that individual headed northbound, after you went into the Fred Meyer parking lot, anything that to you even remotely seemed not purposeful or unintentional?
>
> A: No, sir.
>
> . . . .

---

[122] Id. at 926-27.

[123] Id. at 894.

Q:   When you ordered [Craven] to stop, you told us that he had some words for you?

A:   Yes, sir.

Q:   "Why?  What did I do?"  Is that correct?

A:   Yes, sir.

. . . .

Q:   Did that appear to be in response to your commands?

A:    Yes.

Q:   So, anything about that seem unpurposeful or unintentional?

A:   No, sir.

Q:   Putting the hands up but continuing to walk away and dropping the [backpack], anything about that seem to you [to be] unpurposeful or unintentional?

A:   No, sir.

Q:   And then, putting it all together, all of your observations that day, because sometimes when you have little bits and pieces and you are so focused on little pieces you might not get the big picture, right?  So, I want to now talk about putting all of your observations together on that night of this individual, is there anything combined that causes you to think that any of his actions were not purposeful or unintentional?

A:   No, sir.[124]

The State also demonstrated Craven's motive for killing Smith, his desire to control Cunningham.  Cunningham testified about Craven's escalating use of threats and violence to control her:  a threat from April 2015 to kill her family if

---

[124] Id. at 977-80 (emphasis added).

she refused to marry him;[125] physically assaulting her on June 3;[126] putting a gun to her head on June 6;[127] and taking her dog after they broke up, which he had threatened to do if she broke up with him.[128]  Cunningham also testified about Craven's threats to "kill one of your friends right now, if you say the wrong thing" and to kill Smith "[if] you threaten to call the cops one more time."[129]

Craven contends this evidence does not overwhelm Montemayor's inappropriate opinion because other evidence suggested he was on drugs and unsteady on his feet the night of the arrest.  But a voluntary intoxication defense merely instructs the jury to consider evidence of intoxication when deciding the defendant's intent;[130] it does not mandate acquittal due to any evidence of intoxication.  Cunningham and Luxton, two people who knew Craven better than every other witness, said he threatened their lives and assaulted them intentionally when he was under the influence of drugs.  Lopez testified that on the day of the murders, Craven carefully directed him to Hayden's house and then to Cunningham's house.  The jury would have reached the same verdict regardless of Montemayor's testimony because of the overwhelming evidence

---

[125] RP (May 14, 2018) at 1839.

[126] Id. at 1869-70.

[127] Id. at 1871-73.

[128] RP (May 8, 2018) at 1359-61; RP (May 14, 2018) at 1887-89.

[129] RP (May 14, 2018) at 1836-39.

[130] State v. Webb, 162 Wn. App. 195, 208, 252 P.3d 424 (2011) (citing State v. Thomas, 123 Wn. App. 771, 781, 98 P.3d 1258 (2004)).

of Craven's intentional conduct. The decision to admit Montemayor's testimony was harmless beyond a reasonable doubt.

V. Sixth Amendment Right to Confrontation

Craven argues his Sixth Amendment right to confrontation was violated when the court admitted documents that an inmate provided to a detective investigating Craven's case because the inmate refused to testify and verify that Craven wrote the documents. Craven asserts providing the documents was a communicative act, so admitting them was akin to the inmate testifying to their origin. Assuming Craven's assertion is correct, he waived his right to confrontation because he stipulated to admission of other testimonial hearsay from the inmate.[131]

Both the Sixth Amendment and article I, section 22 of Washington's Constitution guarantee a defendant's right to confront adverse witnesses.[132] Witnesses are either adverse to the defendant and must be produced by the State or helpful to the defendant and may be called if he chooses.[133] "[T]here is not a third category of witnesses."[134] Where the State invites inculpatory hearsay, the defendant must assert his right to confront the absent declarant or

---

[131] RP (May 17, 2018) at 2204-06.

[132] State v. Burns, 193 Wn.2d 190, 207, 438 P.3d 1183 (2019).

[133] Melendez-Diaz v. Massachusetts, 557 U.S. 305, 313-14, 129 S. Ct. 2527, 2534, 174 L. Ed. 2d 314 (2009).

[134] Id. at 314.

he waives it.[135] Placing the burden to object on the defendant supports clarity and judicial efficiency by giving appellate courts a reviewable decision.[136]

Pretrial, Craven contended admitting the documents violated his right to confrontation because providing them was functionally testimonial and the inmate refused to testify. During trial, the inmate still refused to testify, but Craven wanted to admit exculpatory evidence from the inmate's interview with the police and stipulated to its admission.[137] Notably, the court was going to refuse to admit the interview as hearsay and allowed it only because Craven and the State agreed to it.[138] By stipulating to admission of other testimonial hearsay from the inmate, Craven waived his right to confront him. Because he waived this right, he fails to present an appealable decision for review.

VI. 911 Recording

The State played a recording of the 911 call Cunningham made after she discovered Smith's body. In the call, Cunningham calls Craven a "psychopath."[139] The court refused to edit the tape to omit "psychopath" because it was a colloquial use of the word and clearly not used to formally

---

[135] Burns, 193 Wn.2d at 208 (quoting Melendez-Diaz, 557 U.S. at 314 n.3, at 327).

[136] Id. at 211.

[137] RP (May 17, 2018) at 2203-07.

[138] Id. at 2204-05.

[139] Ex. 75 at 1:10-1:15. At trial, Craven argued Cunningham called him a "sociopath." In the recording, she clearly says "psychopath," and appellate counsel agrees. Appellant's Br. at 84 n.14. Regardless, Craven argues either word was prejudicial for the same reasons.

diagnose.  Craven contends the call should have been edited to remove

"psychopath" as irrelevant and unfairly prejudicial.

Evidence is relevant when it has any tendency to make the existence of

any fact more or less likely.[140]  This is a "very low" threshold, and even

"minimally relevant evidence is admissible."[141]  As Craven notes, calling him a

"psychopath" could be pejorative, but the context and Cunningham's vocal tone

illustrated her use of the term was to express fear, shock, and upset, not to

insult.  Craven argues the pejorative use of "psychopath" was prejudicial, but it

is the word's colloquial, nonclinical meaning that makes it relevant.  Her vocal

tone and decision to say "psychopath" corroborated Cunningham's testimony

about her fear of Craven in the months before the assault and killings.

Cunningham testified that she feared for her life in April 2015 when Craven

physically assaulted her.  She also explained she took Craven's threats to kill

her and her loved ones as genuine.[142]  "Psychopath" was relevant.

It was also admissible.  Cunningham's reaction in the minutes after

discovering her friend's corpse was admissible under ER 803(a)(2) as an

---

[140] ER 401.

[141] State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002) (citing State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)).

[142] See, e.g., RP (May 14, 2018) at 1834 (explaining she took Craven's threat to "make you go to everyone's funeral, and then I will take you out" as "[t]hat he is going to kill everyone that I cared about and then kill me after . . . because I wasn't doing what he wanted me to do").

excited utterance.[143]  Even if the word was emotionally loaded, Craven fails to

explain how a single use of "psychopath" in a searing, eight-minute recording

played in the middle of a lengthy trial would inflame the jury's passions

sufficiently to cause prejudice.  Craven fails to show the court abused its

discretion by refusing to remove "psychopath" from the 911 recording.[144]

VIII.  Cumulative Error

Craven argues cumulative error deprived him of a fair trial, requiring

reversal.  "'The cumulative error doctrine applies where a combination of trial

errors denies the accused a fair trial even where any one of the errors, taken

individually, may not justify reversal.'"[145]  A new trial is required when the

"'accumulation of errors most certainly requires a new trial.'"[146]  Assuming

admitting Montemayor's testimony was erroneous, it was undoubtedly harmless

and minor in the context of the entire trial.  Although the prosecutor's closing

argument was improper, the court's clear curative instruction substantially

reduced the risk of prejudice. Thus, it is highly unlikely these errors cumulatively

affected the outcome of the trial when the State presented considerable,

---

[143] See ER 803(a)(2) (an excited utterance is any "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.").

[144] See Darden, 145 Wn.2d at 619 (citing Powell, 126 Wn.2d at 258) (decision to admit evidence is reviewed for abuse of discretion).

[145] State v. Song Wang, 5 Wn. App. 2d 12, 31, 424 P.3d 1251 (2018) (quoting In re Detention of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012)), review denied, 192 Wn.2d 1012, 432 P.3d 1235 (2019).

[146] State v. Clark, 187 Wn.2d 641, 649, 389 P.3d 462 (2017) (quoting State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984)).

compelling evidence on all three charges.  The cumulative error doctrine does not warrant any relief on appeal.

Therefore, we affirm.

_____

WE CONCUR:

_____     _____